789 P.2d 1061

**BIG D CONSTRUCTION CORPORA-TION, a Utah corporation,
Petitioner,**

v.

**The COURT OF APPEALS FOR the STATE of ARIZONA, DIVISION ONE, Edward C. Voss, Presiding Judge, Superior Court of the State of Arizona, In and For the County of Maricopa, the Honorable Alfred J. Rogers, a judge thereof, Respondent Judges,**

**City of Tempe, a municipal corporation, Respondents.**

**BIG D CONSTRUCTION CORPORA-TION, a Utah corporation,
Petitioner,**

v.

**SUPERIOR COURT OF the STATE of ARIZONA, In and For the COUNTY OF MARICOPA, the Honorable Alfred J. Rogers, a Judge thereof, Respondent Judge,**

**CITY OF TEMPE, a municipal corporation, Weitz Company, Inc., an Iowa corporation, Real Parties in Interest.**

Nos. CV–89–0304–SA, CV–89–0362–PR.

Supreme Court of Arizona,
En banc.

March 28, 1990.

Jennings, Kepner & Haug by Curtis A. Jennings, Carolyn M. Kaluzniacki and James L. Csontos, Phoenix, for petitioner.

David R. Merkel, City Atty., City of Tempe, Tempe, for respondent City of Tempe.

Shelley & Behea by J. LaMar Shelley, Mesa, for amicus curiae The League of Arizona Cities and Towns.

Lewis and Roca by Susan M. Freeman, Michael J. Holden, Robert F. Roos and Edward M. Mansfield, Phoenix, for amicus curiae Weitz Co., Inc., Associated General Contractors of America, Arizona Bldg. Chapter and American Subcontractors Ass'n of Arizona.

## OPINION

FELDMAN, Vice Chief Justice.

Big D Construction Corporation (Big D) filed a direct special action petition [1] against the Court of Appeals, Division One, the City of Tempe (Tempe), and Weitz Company, Inc. (Weitz), asking this court to consider the constitutionality of Arizona's bid preference statute, A.R.S. § 34–241. We have jurisdiction pursuant to Ariz. Const. art. 6, §§ 5(1) and 5(3) and Rule 8, Ariz.R.P. Spec.Act., 17B A.R.S.

## FACTS AND PROCEDURAL HISTORY

In early 1989, Tempe invited bids for the construction of the National Football League Cardinals Training Facility and Corporate Headquarters (the Project). Pursuant to a lease agreement between Tempe and B & B Holdings, Inc., d/b/a/ the Phoenix Cardinals (Cardinals), Tempe agreed to contribute a maximum of $6.5 million for the planning and building of the Project. The balance of the cost and any

---

**1.** In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Arizona Rules of Procedure for Special Actions, 17B A.R.S.

cost overruns were to be paid by the Cardinals. The Cardinals provided a letter of credit in the amount of $3,338,000 for Tempe to draw upon to cover "improvements and expenses" required to complete the Project. Upon completion, Tempe will be the legal owner of the property and all improvements, and the Cardinals will be the beneficial owners. The Project is a Tempe public works project and thus is controlled by A.R.S. Title 34.

In response to the notice and call for bids, both Big D, a Utah corporation, and Weitz, an Iowa corporation, submitted bids on the Project. Both companies are qualified to do business in Arizona. The bids were opened on July 18, 1989. The lowest bid was submitted by Big D, in the amount of $7,102,700. The bid submitted by Weitz was approximately $137,000 higher. Pursuant to A.R.S. § 34-201 *et seq.*, Tempe was required to let the bid to the lowest responsible bidder. Just before the Tempe City Council was to award the contract to Big D, however, Weitz filed a bid protest, claiming to be the better bidder under A.R.S. § 34-241, Arizona's bid preference statute.

Tempe's City Attorney held a hearing on August 2, 1989 to determine whether A.R.S. § 34-241 applied to the Project and which company should be awarded the bid. His opinion stated that Weitz's bid was the better bid under the statute and should be considered the low bid. The Tempe City Council awarded the contract to Weitz on August 3, 1989.

Big D filed a Petition for Special Action and Application for Interlocutory Stay of Proceedings in the Maricopa County Superior Court. The stay was granted on August 4, 1989, but after oral argument on August 7, the court denied the requested relief. Big D then filed a Petition for Special Action and Application for Interlocutory Stay of Proceedings in the Arizona Court of Appeals, Division One. The court granted the stay and accepted jurisdiction, but denied the requested relief on August 10. Big D then filed a Petition for Special Action and Application for Interlocutory

Stay in this court, requesting an accelerated hearing in order that the Project's completion date would not be jeopardized.

Due to the summer recess, the earliest date available for the full court to hear the constitutional challenge was in September 1989. Big D therefore voluntarily withdrew its application for a stay, thus permitting Tempe and Weitz to execute the contract and begin construction. Weitz, Big D, and Tempe signed a settlement agreement and release relating to construction of the Cardinals facility. The agreement allowed the action to be dismissed against Weitz but to continue against Tempe. The parties also agreed not to seek further costs, attorney's fees, or other damages from each other notwithstanding Big D's continued pursuit of this action.

After this agreement, Big D filed an amended petition for special action, asking, *inter alia,* that this court hold Arizona's bid preference statute unconstitutional. Big D also filed a petition for review of the court of appeals' decision in the matter to preserve its appeal rights in the event this court declined jurisdiction of the special action. We accepted jurisdiction of the petition for special action, granted the petition for review on the issue of constitutionality,[2] and ordered the two matters consolidated. *Cf. State v. Boykin,* 109 Ariz. 289, 291, 508 P.2d 1151, 1153 (1973). Subsequently, the Arizona League of Cities and Towns was allowed to appear as amicus curiae, urging this court to declare A.R.S. § 34-241 unconstitutional. Weitz, the Associated General Contractors of America, Arizona Building Chapter, and the American Subcontractors Association of Arizona were also allowed to appear as amici, arguing that we should declare A.R.S. § 34-241 constitutional.

## MOOTNESS

■ Because the parties have settled, the controversy between them is moot. Unlike the federal system, however, Arizona's judicial system has no constitutional provision constraining it to consider only

2. *See* Rule 23, Ariz.R.Civ.App.P., 17B A.R.S.

cases or controversies. *See* U.S. Const. art. III. Thus, our reluctance to consider a moot or abstract question is solely a matter of prudential or judicial restraint. *See In re Strobel*, 149 Ariz. 213, 216, 717 P.2d 892, 895 (1986); *Armory Park v. Episcopal Community Servs.*, 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985); *State v. B Bar Enters., Inc.*, 133 Ariz. 99, 101 n. 2, 649 P.2d 978, 980 n. 2 (1982); *Fraternal Order of Police v. Phoenix Employee Relations Bd.*, 133 Ariz. 126, 127, 650 P.2d 428, 429 (1982). We will consider cases that have become moot when significant questions of public importance are presented and are likely to recur. *Fraternal Order of Police*, 133 Ariz. at 127, 650 P.2d at 429.

■ The bid preference statute impacts considerably on the municipal entities and counties that have public contracts to let and must comply with this statute.[3] Compliance with A.R.S. § 34–241 can be very costly to the public, because a five percent preference on a large public project may amount to millions of dollars.[4] The issue is also likely to recur because many bidders on future public works contracts will face the same problem as Big D. Further, the issue is one that evades review. As illustrated by this case, litigation of an adverse decision under the statute is virtually impossible to pursue without jeopardizing the completion date of whatever project is in question.

Finally, although the contest between the actual parties, Big D and Tempe, is moot, the issues have been briefed in an adversarial fashion by these parties and by the various amici, giving this court the benefit of opposing arguments. For these reasons, we exercise our discretion to turn to the merits of the arguments.

## THE STATUTE

A. History of the Arizona Bid Preference Statute

The Arizona preference statute originally was enacted during the "Great Depres-

sion" in 1933 by the Eleventh Legislature. It was introduced as part of House Bill 37 and became part of Chapter 12 of the Session Laws of 1933. The title of the bill as introduced provided:

THAT *RESIDENT* CONTRACTORS *PAYING TAXES ON A PLANT* WITHIN THE STATE, OR THE EQUIVALENT THEREOF, FOR TWO YEARS IMMEDIATELY PRIOR TO THE AWARDING OF THE CONTRACT SHALL BE GIVEN THE PREFERENCE IN AWARDING THE CONTRACT TO THE EXTENT OF TEN PERCENT; ...

H.B. 37, 11th Legislature, Reg.Sess., 1933 (emphasis added).

The bill included an emergency clause that explicitly stated the act's purpose:

Section 9. WHEREAS, many residents of the state of Arizona are without employment and many contractors and producers and dealers within the state of Arizona are without work, or without a market for their products, and non-resident contractors bring into the state non-resident employees to remain and become a burden on the public after their contracts are completed, and many resident contractors, producers and dealers are unable to pay their taxes, and the provisions of this act will tend to relieve such unemployment, to prevent the increase of the unemployed, and to aid in the collection of taxes, the immediate operation of this act is required to preserve the public peace, health and safety, and said act is hereby declared an emergency measure and shall take effect immediately upon its passage in the manner provided by law.

*Id.* As finally adopted, the title of the act provided in relevant part:

AN ACT AMENDING SECS. 1350 TO 1353, BOTH INCLUSIVE, OF THE REVISED CODE OF 1928, ... THE ADDI-

---

**3.** Since the adoption of the State Procurement Code, the State of Arizona and its agencies are exempt from complying with the preference statute. The Procurement Code requires that contracts be awarded to the low bidder. *See* A.R.S. § 41–2533(G).

**4.** Even five percent of the "small" $7.3 million contract for the project in question here could amount to as much as $365,000.

TION OF FIVE NEW SECTIONS RELATING TO QUALIFICATIONS OF EMPLOYEES, AND PROHIBITING EMPLOYMENT OF NONRESIDENTS TO QUALIFICATIONS OF CONTRACTORS, AND *GIVING PREFERENCE TO RESIDENT TAX PAYING CONTRACTORS,* . . .

Laws 1933, ch. 12, § 3 (emphasis added).

As originally enacted, the statute required that to be eligible for the public works statutory preference on a contract, a bidding contractor had to be licensed in Arizona, have successfully completed prior public contracts, and have paid Arizona state and county taxes on a plant and equipment of the type required for performance of the contract (or on real or personal property equivalent in value) for at least two consecutive years prior to making the bid. To qualify for the preference, the bid could not be more than five percent higher than the lowest bid by contractors not entitled to the preference. Code 1939, § 56–107 (currently A.R.S. § 34–241).[5]

## B. Case Law and Statutory Evolution

The constitutionality of this statute was first challenged in *Schrey v. Allison Steel Mfg. Co.*, 75 Ariz. 282, 255 P.2d 604 (1953). In *Schrey*, the city of Glendale awarded a construction contract to the low bidder, Chicago Bridge and Iron Company, a foreign corporation licensed to do business in Arizona and holding an Arizona contractor's license. Allison Steel, an Arizona corporation, had paid taxes for 1950 and 1951 on a plant sufficient to perform the contract and therefore claimed a preference under the statute. Allison Steel filed a mandamus action to compel the city council to award it the contract. The writ was issued and the city appealed, challenging the statute under both the federal and Arizona equal protection clauses (U.S. Const. amend. XIV; Ariz. Const. art. 2, § 13).

This court upheld the statute, concluding that it applied equally to all members of the class, and that the state had a reasonable basis for granting the preference to contractors who contributed to the public funds from which they would benefit. *Schrey*, 75 Ariz. at 287–88, 255 P.2d at 607–08. Later cases involving the bid preference statute followed *Schrey*. *See, e.g., Tanner Cos. v. Superior Court*, 144 Ariz. 141, 143, 696 P.2d 693, 695 (1985) (joint venture entitled to same consideration as single resident contractor; to qualify for preference, contractor must have paid taxes for two years on real or personal property in an amount equal to a reasonable valuation of the plant and equipment necessary to complete the bid); *Mardian Constr. Co. v. Superior Court*, 113 Ariz. 489, 491, 557 P.2d 526, 528 (1976) (statute intended to provide advantage for resident over nonresident contractors); *City of Phoenix v. Superior Court*, 109 Ariz. 533, 535, 514 P.2d 454, 456 (1973); *Western Sun v. Superior Court*, 159 Ariz. 223, 228, 766 P.2d 96, 101 (Ct.App.1989) (payment of another party's tax liability does not entitle one to the benefits of the preference statute).

The statute remained relatively unchanged until 1981, when the legislature deleted the requirement that a contractor

---

5. The statute read as follows:

Hereafter, in the letting of bids for any contract for public work to be performed on behalf of the state of Arizona, or any political subdivision thereof, and to be paid for out of public funds, no bid shall be recognized for the performance of a contract including construction work which is not made by a bidder duly licensed as a contractor in the state of Arizona and in awarding the contract for any work to be paid for out of public funds, bids of contractors who have not been found unsatisfactory in prior public contracts and who have paid state and county taxes within the state of Arizona for not less than two [2] successive years immediately prior to the making of said bid on a plant and equipment such as is ordinarily required for the performance of the contract for which such bid is made, or on other real or personal property in the state of Arizona equivalent in value to such plant, shall be deemed a better bid than the bid of any competing contractor who has not so paid taxes, whenever the bid of such competing contractor shall be less than five [5] per cent lower and the contractor making such bid herein provided to be deemed the better bid, shall be awarded the contract. No contract hereafter awarded for such public work shall be sublet to a sub-contractor who has not paid taxes as hereinabove specified. [R.C.1928, § 1352–B, as added by Laws 1933, ch. 12, § 3, p. 15.]

must be licensed in Arizona to qualify for the bid preference. H.B. 2112, 35th Legislature, Reg.Sess., 1981, ch. 221, § 27. Shortly after *Tanner* was filed, the legislature again amended A.R.S. § 34–241, removing the requirement that, in order to qualify for the preference, a contractor must have paid taxes on property substantially equivalent in value to that needed to perform the contract. Instead, a contractor could qualify for the preference merely by paying taxes of $200 per year for at least two consecutive years immediately prior to submitting a bid. H.B. 2278, 37th Legislature, Reg.Sess., 1985, ch. 149, § 1.

The statute was amended a third time in 1988. This amendment stipulated that the location of the contractor's home office is not a factor in determining whether the contractor qualifies for the preference. H.B. 2250, 38th Legislature, Reg.Sess., 1988, ch. 158, § 1.[6] The 1988 amendment also restored the requirement that the bidding contractor must be licensed under Title 32, ch. 1 or ch. 10. *Id.*

### CONSTITUTIONALITY OF A.R.S. § 34–241

#### A. Contentions

Big D claims that the statutory preference of A.R.S. § 34–241 violates both arti-

cle 2, § 13 of the Arizona Constitution, which provides that "[n]o law shall be enacted granting to any citizen, ... or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations;" and article 4, part 2, § 19, which provides that "[n]o local or special laws shall be enacted ... [g]ranting to any corporation, association, or individual, any special or exclusive privileges, immunities, or franchises."

We turn to these contentions mindful of the precept that we should resolve any doubts in favor of a statute's constitutionality. *Arizona Downs v. Arizona Horsemen's Found.*, 130 Ariz. 550, 554, 637 P.2d 1053, 1057 (1981). If possible, we will construe a statute to give it a reasonable and constitutional meaning. *Id.*

#### B. The Constitutional Tests

■ Big D contends that A.R.S. § 34–241 improperly discriminates between two classes of contractors. However, it is not always a denial of equal protection when the state treats different classes of individuals in different ways. *See Arizona Downs*, 130 Ariz. at 555, 637 P.2d at 1058

---

**6.** A.R.S. § 34–241 now reads:

A. In awarding the contract for work to be paid for from public funds, bids of contractors, who are licensed under title 32, chapter 1 or chapter 10, who have satisfactorily performed prior public contracts, and who have paid state or county taxes within the state for at least two consecutive years in an amount of at least two hundred dollars per year immediately prior to submitting a bid on a plant and equipment such as may be used in the performance of the contract for which the bid is submitted, or on other real or personal property in the state equivalent in value to such plant or equipment, shall be deemed a better bid than the bid of a competing contractor who has not paid such taxes, whenever the bid of the competing contractor is less than five per cent lower, and the contractor making a bid, as provided by this section, which is deemed the better bid, shall be awarded the contract. The location of the home office of the contractor is not a factor in a determination of preference pursuant to this section.

B. No contract awarded for public work shall be sublet to a subcontractor who has not paid taxes as required by this section.

C. For purposes of this section:

1. "Paid state or county taxes within the state" means the contractor has paid real or secured personal property taxes assessed under title 42, chapter 2 or unsecured personal property taxes assessed under title 42, chapter 3.

2. "Satisfactorily performed prior public contracts" means that the contractor has completed a public works contract with any agent or with the United States or any of its instrumentalities.

3. "Two consecutive years immediately prior to submitting a bid" means payment of the complete liability for any of the taxes listed in paragraph 1 for the two tax years immediately preceding submitting the bid. One of the years may be the year in which the bid is submitted. If the second year is the year in which the bid is submitted, the tax payments must be for a complete tax year. Prorated tax payments do not qualify as payment for a complete tax year. Installment tax payments do not qualify as payment for a complete tax year until all installments are paid.

(citing *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972)). When challenged under the equal protection provisions of article 2, § 13, the legality of a particular classification depends on its character, the individuals affected, and the asserted government purpose. *Arizona Downs; State v. Kelly,* 111 Ariz. 181, 184, 526 P.2d 720, 723 (1974), *cert. denied,* 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975).

■■■ The test applied to evaluate a challenged classification varies. If the statute limits a "fundamental right" or affects a suspect class, we subject it to strict scrutiny and will only uphold it if it is necessary to promote a compelling state interest. But if the statute does not affect a fundamental right or a suspect class, we will apply the "rational basis" test. The rational basis test applies particularly to legislation that is a form of economic regulation. *Arizona Downs.*

■■■ The parties all agree that the bid preference statute is strictly economic legislation. No suspect classifications are involved, nor does the statute affect any fundamental rights. Therefore, the "rational basis" test applies. Under the rational basis test, a statute must be rationally and reasonably related to furthering some legitimate governmental interest. *Bryant v. Continental Conveyor Equip. Co.,* 156 Ariz. 193, 197–98, 751 P.2d 509, 513–14 (1988); *Arizona Downs,* 130 Ariz. at 555–56, 637 P.2d at 1058–59; *Uhlmann v. Wren,* 97 Ariz. 366, 388, 401 P.2d 113, 128 (1965). A perfect fit is not required; a statute that has a rational basis will not be overturned "merely because it is not made with 'mathematical nicety, or because in practice it results in some inequality.'" *Bryant,* 156 Ariz. at 197, 751 P.2d at 513 (quoting *Uhlmann,* 97 Ariz. at 388, 401 P.2d at 128).

■■■ To withstand scrutiny, however, the statute must not be arbitrary or irrational, and must be reasonably related to furthering a legitimate state purpose. *Bryant.* In determining whether a statute meets the rational basis standard, we must first ascertain whether the challenged legislation has a legitimate purpose and then determine if it is reasonable to believe that the classification will promote that purpose. *See JV–111701 v. Superior Court,* 163 Ariz. 147, 786 P.2d 998 (Ct.App.1989) (citing *Western & Southern Life Ins. v. State Bd. of Equalization,* 451 U.S. 648, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981)).

A somewhat similar test is applied to statutes attacked as violating the special legislation prohibition, article 4, pt. 2, § 19:

> Whether a law is attacked as special legislation or as violative of equal protection, it is still the duty of the courts to decide whether the classification is unreasonable in that it preferentially and arbitrarily includes a class (special legislation) to the exclusion of all others, or improperly denies a benefit to a class (equal protection).... While certain pieces of legislation may be attacked as both special legislation and [violating] equal protection since they confer a benefit on one class while denying a benefit to another, there will be many cases where a benefit is conferred on one class to which no other class has a right. In those cases, legislation would be attacked as special legislation but not as [violating] equal protection.

*Arizona Downs,* 130 Ariz. at 557, 637 P.2d at 1060 (quoting *Illinois Polygraph Soc'y v. Pellicano,* 83 Ill.2d 130, 46 Ill.Dec. 574, 579, 414 N.E.2d 458, 463 (1980)).

## C. The State's Interest

Various purposes have been suggested for the bid preference statute. The original purpose stated by the legislature was to provide employment for Arizona residents and contractors, to prevent increased unemployment due to non-resident employees being brought into the state by non-resident contractors and remaining after completion of construction, and to aid in the collection of taxes. *See* Emergency Clause, *supra* at 563, 789 P.2d at 1064.

This court suggested another and related purpose in *Schrey,* when we concluded that it was legitimate to grant a preference to

contractors who, through payment of certain taxes, "have made a contribution to the funds from which they are to reap a benefit." 75 Ariz. at 287, 255 P.2d at 607. In its reply brief, Tempe lists several similar "legitimate state purposes" that it claims the statute is designed to achieve: (1) grant a preference to contractors who incur direct tax liability through ownership of property in the state and thus contribute to state funds, *Western Sun*, 159 Ariz. at 228, 766 P.2d at 101; (2) provide continuous work for Arizona businesses, *Mardian*, 113 Ariz. at 492, 557 P.2d at 529; (3) aid in the collection of taxes, *Tanner*, 144 Ariz. at 145, 696 P.2d at 697; and (4) prefer those who contribute to a state's economy through construction activities within the state, *Galesberg Constr. Co. v. Board of Trustees*, 641 P.2d 745, 750 (Wyo.1982); *APAC–Mississippi, Inc. v. Deep South Constr.*, 288 Ark. 277, 704 S.W.2d 620, 624 (1986).

■ Assuming, *arguendo*, that these are constitutionally permissible state purposes,[7] we must still inquire whether the statute has any reasonable relationship to furtherance of any of these interests.

## D. Is it Reasonable to Believe that the Statute may Further the State's Interest?

■ It is no longer possible now to defend the statute on the basis that it reasonably may be thought to further its original purposes. Although a rational basis for the privileges granted by the statute may have existed at the time it was enacted in 1933, it has ceased to exist. One of the original purposes of the statute was to ensure that bona-fide "resident contractors"—Arizona firms—would receive the preference. *See Tanner*, 144 Ariz. at 145, 696 P.2d at 697; *Mardian*, 113 Ariz. at 492, 557 P.2d at 529. The statute no longer requires that a public works contract be

---

7. The privileges and immunities clause, U.S. Const. art. IV, § 2, prohibits some, but not all, forms of discrimination against citizens of other states. Determining whether a particular instance of discrimination against non-residents is prohibited involves a two-step inquiry. *United Bldg. & Constr. Trades Council v. Mayor of Camden*, 465 U.S. 208, 218, 104 S.Ct. 1020, 1027, 79 L.Ed.2d 249 (1984).

First, the court must determine whether one of the privileges and immunities protected by the clause is burdened. *Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 383, 98 S.Ct. 1852, 1860, 56 L.Ed.2d 354 (1978). The Supreme Court has held that the right in question here—employment on public works contracts in another state—is fundamental and falls within the protection of the privileges and immunities clause. *United Bldg. & Constr.*, 465 U.S. at 221–22, 104 S.Ct. at 1029.

Once it is determined that a fundamental privilege is burdened, the next inquiry is whether there is a "substantial reason" for the difference in treatment, beyond the mere fact that a non-resident is involved. *See id.; Toomer v. Witsell*, 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948). The substantial reason test permits disparate treatment of non-residents if the fact of their non-residence can be shown to "constitute a peculiar source of the evil at which the statute is aimed." *United Bldg. & Constr.*, 465 U.S. at 222, 104 S.Ct. at 1029 (citing *Toomer*).

A shortcoming of the substantial reason test is that it does not "explicitly require consideration of a state's legitimate interest in discriminating against outsiders to preserve goods and opportunities to which the citizens and government of that state have devoted their labor and their public fisc." L. TRIBE, AMERICAN CONSTITUTIONAL LAW 544 (2d ed. 1988). Professor Tribe suggests that one way to honor the state's interest in favoring its own is for the state to "justify its discrimination by adverting to its role in creating and nurturing the good or opportunity in question and to its character as a politically cohesive entity." *Id.*

This approach has been implicitly endorsed by the Supreme Court in *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (striking down Alaska Hire statute, which required that residents be given preference for most jobs in the state's oil industry). *Hicklin* stands for the proposition that the privileges and immunities clause forbids unequal treatment of non-residents with respect to goods and opportunities that exist within the state but are not attributable to state programs or revenues. TRIBE, *supra*, at 1382 n. 22. This suggests that where an opportunity *can* be attributed to state programs or revenues, and there is a substantial reason to justify it, the state may discriminate against non-residents.

Thus, perhaps a preference favoring state residents can be justified on the ground that public funds are involved in public works contracts. If so, the present version of the statute is irrelevant because it does not favor Arizona firms, those with a substantial presence in Arizona, nor those that have made significant contributions to the public fisc.

awarded to a resident contractor. In fact, the statute now specifically states that the location of the home office of the contractor is not a factor. Nor does the statute any longer restrict the preference to non-resident firms having offices in the state or a presence in the state. The present version of the statute does not reserve the preference to businesses located in Arizona.

It is equally clear that this statute in no way affects the employment of residents of Arizona, or prevents construction companies from importing out-of-state labor. Nothing in the statute requires, or even encourages, either resident or non-resident contractors to hire Arizona residents. It makes little economic sense for any company, resident or not, to hire out-of-state employees if in-state labor is available. If in-state labor is not available, or even if it is, nothing in the statute prevents or discourages the importation of out-of-state workers. No one has suggested, nor can we perceive, any method by which this statute could reduce Arizona's unemployment or "aid" the collection of taxes.

It is also impossible to defend the statute under any other purpose enunciated since the statute was enacted. When we last examined the constitutionality of A.R.S. § 34–241, we concluded that, although the statute operated unequally and granted a privilege to some contractors and not others, the statute was constitutional because a reasonable basis existed for granting the preference to contractors who "made a contribution to the funds from which they [were] to reap a benefit." *Schrey*, 75 Ariz. at 287, 255 P.2d at 607. Although this may once have been true, it is no longer.

At the time *Schrey* was decided, the statute required payment of taxes on a plant and equipment of the type or value required to perform the job, or on other real or personal property equal in value. In *Tanner*, this court held that to qualify for

the preference, a contractor must have paid taxes for two years on real or personal property *in an amount equal to a reasonable valuation of the plant and equipment necessary to complete the bid.* 144 Ariz. at 145, 696 P.2d at 697. Thus, in *Tanner*, the majority required a rational relationship between the amount of taxes paid by the preferred contractor and the privilege conferred. The statute as amended in 1985 now merely requires payment of Arizona taxes for two consecutive years in the amount of at least $200 per year. A tax payment of $400 is so insignificant in proportion to the amount of the potential preference conferred on even a modest size public work job that any reasonable relationship between the statute and furtherance of the legislative purpose described in *Schrey* has been destroyed.

It is now possible for a contractor to qualify almost instantly for the preference. For example, an ingenious bidder can potentially qualify for the preference by moving a trailer into the state a few days before bid submission and persuading the county assessor to accept payment of two years worth of personal property taxes. *Tanner*, 144 Ariz. at 147, 696 P.2d at 699 (Feldman, J., dissenting).[8] A contractor can also qualify for the preference by forming a "joint venture" with an individual not in the contracting business who has already paid taxes on property held for purposes entirely unrelated to construction work. *Id.* at 146–47, 696 P.2d at 698–99. Certainly a statute that discriminates in such a manner produces whimsical, arbitrary, and capricious results.

In addition, because only tax payments on owned real and personal property qualify a contractor for the preference, a contractor who has worked in Arizona for many years but has leased or rented equipment and office facilities will not receive the preference. *Id.* at 144 n. 2, 696 P.2d at 696 n. 2. Of course, economic reality tells

---

**8.** This has been successfully accomplished. *See Brinderson Co. v. Superior Court*, No. 17352–SA

(Ariz.Sup.Ct., jurisdiction declined Feb. 2, 1984).

us that the lessee's rent covers the lessor's tax payments, but this statute does not take notice of such things. *Western Sun,* 159 Ariz. at 228, 766 P.2d at 101. The contractor may have paid many thousands of dollars in Arizona taxes,[9] and may have hired many Arizona residents (*Tanner,* 144 Ariz. at 147, 696 P.2d at 699), but will still fail to qualify for the bid preference. The statute completely ignores the fact that much contracting is done today by contractors who lease or rent the equipment used to perform their contracts. The statute, therefore, may work directly against its original intent by discriminating against firms that operate in Arizona by leasing equipment and employing Arizona residents.

We conclude that the present version of A.R.S. § 34–241 fails to further any of the legitimate state interests suggested in the cases or by the parties. As noted in *Schrey,* the statute does discriminate and grant privileges, treating bidders unequally. 75 Ariz. at 286, 255 P.2d at 606. The unequal impact of this law affects members of both the burdened and privileged classes in an arbitrary and whimsical manner, thereby violating the basic concept of equal protection.

We are mindful, also, that the statute places a burden on Arizona taxpayers, who must pay up to five percent over low bid—perhaps millions of dollars extra per year—whenever the statutory preference comes into play, even when the preference benefits non-Arizona firms employing non-Arizona labor. This harmful effect on the public as a whole goes to the very heart of the prohibition against special legislation in article 4, pt. 2, § 19, which was intended by its framers to ensure that "government would not unfairly favor particular enterprises or individuals," and that "the players in the economy were on a level field." Leshy, *The Making of the Arizona Constitution,* 20 ARIZ.ST.L.J. 1, 96 (1988).

### E. Other Authority

Tempe points out that public contract preferences have been upheld around the country and that, in fact, Arizona's bidding preference is less stringent than most because it does not handicap non-residents—anyone can qualify for the preference by paying a relatively small amount of taxes.

The preference statutes in the cases cited by Tempe can easily be distinguished from the present Arizona statute. Tempe first cites *Equitable Shipyards, Inc. v. State,* 93 Wash.2d 465, 611 P.2d 396 (1980), which upheld a bid preference statute against an equal protection challenge. The Washington statute, R.C.W. 47.60.670, establishes a six percent preference for shipbuilding firms *located in Washington.* The purpose of this statute was to grant a preference to those who contribute to the state's economy. *Equitable Shipyards,* 611 P.2d at 404. The Washington Supreme Court found that the articulated purpose of this statute bore a rational relationship to the classifications of in-state and out-of-state firms, favoring bidders who offered ships built in Washington. *Id.*

Tempe also cites *Associated Gen. Contr. v. City & County of San Francisco,* 813 F.2d 922 (9th Cir.1987), which upheld a local ordinance (Ordinance § 12D.2(1)), granting a five percent preference to locally owned businesses for city contracts let out for bid. Unlike Arizona's law, the preference applies to firms with offices or distribution points in San Francisco that are listed in the Permits and License Tax Paid File with a San Francisco business street address. Ordinance § 12D.5. The purposes of the ordinance are to reduce the burden on local businesses due to the high costs of doing business in the city and to encourage businesses to locate and remain in San Francisco. *Associated Gen. Contr.,* 813 F.2d at 943. The ninth circuit found that the ends and means employed by the city fell within the discretion permitted under the equal protection clause. The preference did not impose a discriminatory bur-

---

9. For example, Big D did not qualify for the bid preference under A.R.S. § 34–241 but has paid Arizona taxes in the amount of $18,000—well above the $400 required by the statute. How-

ever, the taxes paid by Big D were use taxes, not real or personal property taxes as specified in the statute.

den on non-residents solely because of their residency status, but was an attempt to lighten the burden that San Francisco businesses must bear that is not shared by non-residents. *Id.*[10]

The final case cited by Tempe is perhaps the closest to Arizona's statute, but can still be distinguished. In *APAC–Mississippi,* the Arkansas Supreme Court upheld a bid preference that granted a three percent preference. Although the Arkansas preference statute, like Arizona's, grants a preference to non-resident contractors who pay taxes for two years prior to bidding, the type of taxes that qualify directly benefit those who have benefited the state's economy. The Arkansas preference is awarded to those who have paid taxes on real or personal property *used or intended to be used in performance of or in connection with construction contracts.*[11] *APAC–Mississippi,* 704 S.W.2d at 622.

These cases uphold statutes much different from ours. We find no authority for the proposition that a state may award a public contract worth many millions, preferring a higher bidder over a lower, simply because the former may have paid a few hundred dollars of taxes in the past, and even though the latter may have also paid a different type of Arizona taxes. All of the cases that uphold preference statutes do so on bases no longer reflected in Arizona's statute—residency, in-state presence, in-state employment, payment of a relevant amount of taxes, and the like.

## CONCLUSION

Arizona's bid preference statute, A.R.S. § 34–241, creates an economic burden, not a benefit, for the public entities bound to follow it. It has been so altered by amendment that the financial burden it imposes, the discrimination it effects, and the privileges it confers are no longer rationally related to any legitimate state purpose. Even if we assume the original problems and objectives still exist and a preference statute is necessary to remedy grave economic ills, we do not believe that the discrimination created and privileges conferred by the present version of the statute will reasonably further that objective. The statute is arbitrary, encourages subterfuge, is expensive to the public entities that must comply with it, and simply wastes taxpayers' money. For these reasons, we hold A.R.S. § 34–241 violates the equal protection guarantee of article 2, § 13 and the special privilege section of article 4, pt. 2, § 19. We hold it unconstitutional.

This case is decided under the Arizona Constitution, thus making it unnecessary to consider federal constitutional issues. *See Michigan v. Long,* 463 U.S. 1032, 1042, 103 S.Ct. 3469, 3477, 77 L.Ed.2d 1201 (1983). We therefore do not consider the other issues raised. The portion of the judgment

---

10. Three other cases cited by Tempe may be distinguished in a similar manner and for similar reasons. *See Bristol Steel & Iron Works v. State,* 507 So.2d 1233 (La.1987) (statute encourages Louisiana's industry by granting a five percent preference to resident contractors (LSA–R.S. 38:2225(A)), or gives a resident Louisiana contractor the percentage of preference over a non-resident bidder that would be given to that bidder in his home state (LSA–R.S. 38:2225(B)); *Gary Concrete Prods., Inc. v. Riley,* 285 S.C. 498, 331 S.E.2d 335 (1985) (upholding statute, S.C. Code Ann. § 11–35–1520(9)(d) (1984 Cum. Supp.), which grants preference to vendors if they maintain an office within the state, maintain a representative inventory, and have paid all assessed taxes); *Galesberg Constr.* (statute grants five percent preference to resident contractors over non-residents).

11. Several other states have bid preference statutes. These tend to be of two types—either specifically favoring resident contractors, *see, e.g.,* Alaska, Alaska Stat. §§ 18.55.460 and 44.-33.295; Maine, 26 Me.Rev.Stat.Ann. § 1301; and New Mexico, N.M.Stat.Ann. 13–4–2; or granting what can be termed a "reciprocal" preference, *see, e.g.,* Alabama, Ala.Code § 39–3–5; Idaho, Idaho Code § 67–2348; Louisiana, La. Rev.Stat.Ann. § 38:2225; Missouri, Mo.Rev.Stat. § 34.076; Nevada, Nev.Rev.Stat. § 338.147; Ohio, Ohio Rev.Code Ann. § 153.012; Oklahoma, Okla.Stat. Title 61, § 14; Utah, Utah Code Ann. § 63–56–20.6; and Virginia, Va.Code Ann. § 11–47. The reciprocal preference statutes grant a resident contractor the same percentage preference over a non-resident contractor as the non-resident contractor would be granted by its domiciliary state. Both types of preference statutes differ considerably from Arizona's.

upholding the constitutionality of the stat-
ute is vacated.

GORDON, C.J., and CAMERON,
MOELLER and CORCORAN, JJ., concur.