927 P.2d 340

**PHOENIX NEWSPAPERS, INC., an Arizona corporation, d/b/a The Arizona Republic, and Judy Nichols, Plaintiffs–Appellants,**

v.

**Helen PURCELL, Maricopa County Recorder, a public officer, and Maricopa County, a public body; State of Arizona, a public body, Defendants–Appellees.**

No. 1 CA–CV 94–0223.

Court of Appeals of Arizona,
Division 1, Department E.

Feb. 22, 1996.

Reconsideration Denied March 22, 1996.

Review Granted on Issue No. 3 and Denied on Other Issues Nov. 19, 1996.

---

Morrison & Hecker by James F. Henderson, Patricia A. Sallen, Phoenix, for Plaintiffs–Appellants.

Grant Woods, Arizona Attorney General by Anthony B. Ching, Assistant Attorney General, Phoenix, for Defendant–Appellee State of Arizona.

## OPINION

PATTERSON, Judge.

This appeal requires us to decide the constitutionality of Arizona Revised Statutes Annotated ("A.R.S.") section 16–168(E). This section authorizes the Maricopa County Recorder's Office to provide voter registration lists for purposes provided under the statute and requires a fee for such use. We hold that section 16–168(E) does not violate equal protection or public policy, nor does it constitute special legislation. We therefore affirm the trial court.

## I. *FACTS AND PROCEDURAL HISTORY*

In July, 1992, Judy Nichols, a reporter for Phoenix Newspapers, Inc. ("PNI"), requested a magnetic tape copy of the Maricopa County voter registration list ("list") from the County Recorder, Helen Purcell. The request noted that it would be used for non-commercial, PNI business.

Purcell responded that she could provide the list if PNI satisfied the requirements of section 16–168(E), which provides:

> Precinct registers and other lists and information derived from registration forms may be used only for purposes relating to a political or political party activity, a political campaign or an election, for revising election district boundaries, or for any other purpose specifically authorized by law. The county recorder shall, upon a request for such use and within thirty days from receipt of such request, prepare additional copies of any precinct register and furnish them to any person requesting them upon payment of a fee equal to five cents for each name appearing on the register for a printed list and ten cents for each name for an electronic data medium, plus the cost of the blank computer tape or disc if furnished by the recorder, for each copy so furnished.

Purcell further wrote that since there were more than 1,140,000 registered voters in Maricopa County, the list would cost approximately $114,000 for a magnetic computer tape or $57,000 for a printed list.

An attorney for PNI responded to Purcell's letter stating that he believed section 16–168(E) to be unconstitutional. He also offered to pay $20 per hour for the computer time needed to copy the magnetic tape plus any costs for personnel time. A deputy county attorney responded to the letter declining the offer because the county recorder was bound by section 16–168(E).

PNI and Nichols (collectively "PNI") filed a complaint for special action against Purcell and Maricopa County seeking an order directing the County Recorder to provide copies of the lists at a reasonable cost. The trial court determined that although the voter registration lists were public records, access was not contravened by section 16–168(E).

PNI then amended the complaint to add the State of Arizona as a defendant. The trial court dismissed the complaint against Purcell and Maricopa County with prejudice.[1] Thereafter, PNI filed for summary judgment arguing that section 16–168(E) contravened the policy of access and openness explicit in Arizona's public records laws, violated equal protection, and constituted special legislation.

The State filed a cross-motion for summary judgment arguing the constitutionality of section 16–168(E). The trial court granted the State's motion and denied PNI's motion for summary judgment. PNI filed a timely appeal from the trial court's judgment.

## II. *DISCUSSION*

### A. *Equal Protection*

■ PNI first argues that section 16–168(E) violates Article 2, Section 13 of the Arizona Constitution. This section has been held to have the same effect as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *See Big D Const. Corp. v. Court of Appeals*, 163 Ariz. 560, 565–66, 789 P.2d 1061, 1066–67 (1990). We determine that its effect here is the same.

#### 1. *Standard of Review*

■ We begin our analysis by noting that whenever the validity of a statute is questioned there is a strong presumption of constitutionality. *Republic Inv. Fund I v. Town of Surprise*, 166 Ariz. 143, 148, 800 P.2d 1251, 1256 (1990). Where the constitutionality of a statute is challenged under the equal protection clause, "the legality of a particular classification depends on its character, the individuals affected, and the asserted government purpose." *Big D Const.*, 163 Ariz. at 566, 789 P.2d at 1067.

1. The judgment included finality language pursuant to Rule 54(b) of the Arizona Rules of Civil Procedure. PNI did not appeal that judgment.

■ The test to determine the nature of a classification involves a two-tiered analysis. *Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 555, 637 P.2d 1053, 1058 (1981). If the statute is aimed at limiting a fundamental right, "we apply a test of strict scrutiny and we will uphold the statute only if it is necessary to promote a compelling state interest." *Id.* "Similarly, if the statute discriminates among individuals based on a 'suspect class,' it is also subjected to strict scrutiny." *Id.*

"If, however, the challenged statute does not impact upon a fundamental right or a suspect class, the statute will be upheld if it has any conceivable rational basis to further a legitimate governmental interest." *Id.* PNI does not argue that the right to obtain a copy of voter registration records is a fundamental right, nor does it argue that it affects a suspect class. We further note that PNI applies a rational basis standard in its analysis of the statute.

### 2. *Rational Basis Test*

■ For our review a rational basis test will be applied. This test "upholds legislative regulation which imposes burdens on one class but not another so long as (1) the court can find some legitimate state interest to be served by the legislation and (2) the facts permit the court to conclude that the legislative classification rationally furthers the state's legitimate interest." *Kenyon v. Hammer*, 142 Ariz. 69, 78, 688 P.2d 961, 970–71 (1984); *see also Big D*, 163 Ariz. at 566, 789 P.2d at 1067. The party challenging the statute has the burden of establishing "that the legislature's classifications are purely arbitrary and not rationally related to a legitimate legislative purpose." *Cherry v. Steiner*, 543 F.Supp. 1270, 1279 (D.Ariz.1982), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 190 (1984).

### a. *Limitation on Uses of Voter Information*

PNI first questions the requirement that information derived from the voter registration records shall be used only for purposes relating to political activity, campaigns or elections. PNI submits that no evidence has been offered to support the trial court's finding that a legitimate state interest is furthered by this statutory provision.

■ A court, under the rational basis test, may consider "either the actual basis on which the legislature acted or any hypothetical basis on which it might have acted." *Church v. Rawson Drug & Sundry Co.*, 173 Ariz. 342, 350, 842 P.2d 1355, 1363 (App. 1992), (quoting *Carr v. Beech Aircraft Corp.*, 758 F.Supp. 1330, 1334 (D.Ariz.1991)).

The State has not set forth any rational basis nor does the legislative history[2] indicate any rationale behind limiting the use of voter registration information to political, campaign, and election purposes. We, however, perceive a basis upon which the legislature validly could have believed it was necessary to limit copies of voter registration information.

■ Section 16–168(E) protects registered voters from unwanted intrusions into their privacy caused by the wholesale distribution of registration information. Copies of the lists used for non-commercial purposes, unrelated to campaigns and elections, could lead to annoying situations for registered voters.[3] For example, a group might use the information contained in the list for recruitment drives.

Such uses might discourage some citizens from registering to vote while public policy strongly advocates greater voter registration and participation. This result would run counter to the perceived legislative purpose of enacting section 16–168(E) to encourage and facilitate public elections. We therefore

2. Paragraph E of A.R.S. section 16–168 was added in 1979. *See* Laws 1979, Ch. 209, § 3. The legislative record of House Bill 2028, of which the addition of paragraph E was a part, does not include any discussion of section 16–168(E). The paragraph was amended again in 1991 to increase the charge of two cents per hard copy to five cents per copy. *See* Laws 1991, Ch. 310,

§ 20 (Senate Bill 1390). That legislative record reveals no discussion either.

3. Commercial uses are restricted by Arizona Public Records Law pursuant to A.R.S. sections 39–121 through 39–121.03.

find that the first sentence of A.R.S. section 16–168(E) serves a legitimate state interest.

b. *Classification Under Section 16–168(E)*

PNI next argues that the classification under A.R.S. section 16–168(C) which gives major political parties free copies of voter registration lists—while A.R.S. section 16–168(E) requires all others to pay—does not serve legitimate state interests.

■ We agree with the State that the classifications used in sections 16–168(C) and 16–168(E) further legitimate state interests. First, the classification of major political parties as recipients of free lists aids the recorder's office and the election process. With the lists, the parties can provide information to party candidates and contact registered voters concerning elections. The ability of political parties to provide this information prevents the recorder's office from receiving numerous overly burdensome and possibly capricious requests for copies of the lists. In other words, it helps make the recorder's workload manageable.

■ Furthermore, a state does not violate equal protection when it provides certain benefits in the election process to political parties that have substantial public support. *See, e.g., Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Accordingly, the legitimate governmental interests of administrative efficiency in the recorder's office and convenience for political candidates and voters are furthered by providing free copies of voter registration documents to major political parties.

c. *Amount Charged*

Our inquiry, however, does not end with this conclusion. Even if the State's purposes are constitutionally permissible, we must further "inquire whether the statute has any reasonable relationship to the furtherance of any of these interests." *See Big D*, 163 Ariz. at 567, 789 P.2d at 1068 (although state purposes were constitutionally permissible, the bid preference statute failed to further those purposes). As previously noted, charging a fee for the copies does further legitimate state interests.

The question we now address is whether the statute's requirement that all others except major political parties pay for copies is rationally related to a legitimate state interest. The State argues that the charge is necessary to compensate the recorder's office for its labor. We agree.

■ Although we note that the costs imposed by section 16–168(E) can be quite high, this court "cannot sit as a super-legislature to determine the wisdom, the necessity, or the inconvenience of a legislative enactment." *Shaw v. State of Arizona*, 8 Ariz. App. 447, 452, 447 P.2d 262, 267 (1968). It is not necessary that a law be logically consistent with respect to all of its aims. *Arizona Downs*, 130 Ariz. at 556, 637 P.2d at 1059. It is sufficient that an evil exists and that the particular legislative measure is a rational way to correct it. *Id.*

> The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought ... "For protection against abuses by legislatures the people must resort to the polls, not to the courts."

*Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 488, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955); *accord James v. Strange*, 407 U.S. 128, 133, 92 S.Ct. 2027, 2031, 32 L.Ed.2d 600 (1972) ("[m]isguided laws may still be constitutional"); *State v. Arnett*, 119 Ariz. 38, 48, 579 P.2d 542, 552 (1978) ("reasonable, even though debatable, basis" sufficient to uphold statute unless "clearly unconstitutional").

■ We conceive of several bases that rationally further the state's interest. First, the legislature could have intended that section 16–168(E) be cost-effective for Arizona taxpayers. The statute achieves this purpose by requiring anyone other than political parties to pay for the list. These fees serve valid governmental purposes because they underwrite the expenses for compilations of the list. Availability and access to the public, however, are not contravened.

The cost provision in the statute also enhances the efficient regulation of the election process. Staffing government offices at minimal levels is allowed by the private/public partnerships which this type of arrangement evidences. Private entities, such as political parties, are utilized in the election process to facilitate the expansion and hoped-for efficacy of our democratic governmental system.

While we note that the statutory fee of five cents per name for a printed list and ten cents per name for an electronic media seems reasonable, the actual cost of the entire list for PNI is quite high. Here, however, we defer to the legislature's determination as to what level of fee best protects the interest of the state. We do not conclude that the legislature may set a truly prohibitive cost.

Because we view the preference given by the statute to major political parties as rationally furthering the above legitimate state objective, we find it does not violate due process or equal protection. *Jenness*, 403 U.S. at 441–42, 91 S.Ct. at 1975–76; *Arizona Downs*, 130 Ariz. at 557, 637 P.2d at 1060. We believe the reasons given by the State are valid and rationally related to the legitimate state interests of using governmental resources efficiently. In addition, charging members of the public for copies of voter registration records furthers the reasonable goal of requiring users of some governmental services to pay for them rather than burden the taxpayers at large with the expense.

### B. *Special Laws*

PNI next argues that section 16–168(E) is special legislation in violation of Article 4, Part 2, Section 19(13) of the Arizona Constitution. That provision provides in relevant part:

No local or special laws shall be enacted in any of the following cases, that is to say:
* * *

13. Granting to any corporation, association, or individual, any special or exclusive privileges, immunities, or franchises....

PNI claims that section 16–168(E) provides a benefit to a select group—major political parties—by providing them free copies of the voter registration lists.

■ Legislation may be challenged both as violative of equal protection and as special legislation. *Arizona Downs*, 130 Ariz. at 557, 637 P.2d at 1060. Because the two provisions were promulgated to address different evils, a statute may withstand equal protection review, yet still be found unconstitutional under the special law provision. *Id.*

### 1. *Special Laws Test*

■ In *Republic Inv. Fund I*, our supreme court developed a three part analysis: a law is not special legislation if it (1) bears a "rational relationship to a legitimate legislative objective"; and (2) "the classification encompasses all members of the relevant class"; and (3) "the class is elastic, allowing members to move into and out of the class." 166 Ariz. at 149, 800 P.2d at 1257 (citing *Arizona Downs*, 130 Ariz. at 557–58, 637 P.2d at 1060–61).

#### a. *Rational Relationship and Classification*

■ "A law is general, and thus permissible, if it confers rights and privileges or imposes restrictions upon all members of a given class, when the classification has a reasonable basis." *Arizona Downs*, 130 Ariz. at 557, 637 P.2d at 1060. A special law, on the other hand, is only applicable "to certain members of a class, or to an arbitrarily defined class which is not rationally related to a legitimate legislative purpose." *Id.*

As previously discussed, section 16–168(E) applies to classifications that are rationally related to legitimate governmental purposes. Free copies of voter registration lists are available to all major political parties; all others must pay for the copies. The rights and restrictions imposed by this statute apply equally to all members of the designated classes.

#### b. *Elasticity of the Classification*

■ In order to be a general law, "the classification must be elastic, or open, not only to admit entry of additional persons, places, or things attaining the requisite char-

acteristics, but also to enable others to exit the statute's coverage when they no longer have those characteristics." *Republic Inv. Fund I,* 166 Ariz. at 150, 800 P.2d at 1258.

 The classifications in section 16–168(E) encompass all members of each class. Persons may move into and out of major political parties and acquire leadership or candidate roles that would enable them to obtain voter registration information from the parties. New political parties may emerge and become eligible for free copies of voter registration records by placing four candidates on an election ballot. Established political parties may be disqualified for the free copies by not placing four candidates on an election ballot. The challenged portions of section 16–168(E) do not constitute special legislation, and the provision of free copies to major political parties while charging others is therefore permissible.

### C. *Public Policy Argument*

We now address PNI's argument that section 16–168(E) violates Arizona's public policy of openness in public records. PNI contends that the statute does so by placing an unduly restrictive cost requirement on the public's ability to obtain copies of the list. We disagree.

While it is well settled that Arizona evinces a general "open access" policy toward public records, *Carlson v. Pima County,* 141 Ariz. 487, 489, 687 P.2d 1242, 1244 (1984); *see also* A.R.S. §§ 39–121—121.03, the availability of such records is not without qualification. *Carlson,* 141 Ariz. at 490–91, 687 P.2d at 1245–46.

The legislature sets the fee in accordance with its concern for the best interests of the State in carrying out its legitimate activities. *See Carlson,* 141 Ariz. at 491, 687 P.2d at 1246. The statute provides for a right of inspection by the public and copying is permitted pursuant to a fee schedule as determined by the statute. We therefore find that section 16–168(E) does not contravene the policy of access and openness explicit in Arizona's public records laws.

### III. *CONCLUSION*

In summary, we find that section 16–168(E) does not violate equal protection. We further find, giving due deference to the state legislature, that the amount charged for copies of the list is rationally related to legitimate state interests and is not arbitrary. Section 16–168(E) does not constitute special legislation or contravene the "public access" policy implicit in Arizona's public records law. We therefore affirm the decision of the trial court.

GRANT, P.J., and WEISBERG, J., concur.