77 P.3d 451

Harold Donald STANDHARDT, a single
man;  Tod Alan Keltner, a single
man, Petitioners,

v.

SUPERIOR COURT of the State of Ari-
zona, In and For the COUNTY OF
MARICOPA;  Michael K. Jeanes, the
Clerk of the Court, Respondents,

State of Arizona, Real Party in Interest.

No. 1 CA–SA 03–0150.

Court of Appeals of Arizona,
Division 1, Department E.

Oct. 8, 2003.

Kent & Ryan, P.L.C., By Michael S. Ryan, Candace H. Kent, Phoenix, Attorneys for Petitioners.

Terry Goddard, Arizona Attorney General, By Kathleen P. Sweeney, Assistant Attorney General, Phoenix, Attorneys for Real Party in Interest State of Arizona.

Alliance Defense Fund Law Center, By Benjamin W. Bull, Gary S. McCaleb, Joshua W. Carden, Scottsdale, Attorneys for Amicus Curiae Senator Mark Anderson.

American Civil Liberties Union Foundation, By Pamela K. Sutherland, Legal Director, Arizona Civil Liberties Union/Foundation, New York, Tucson, Amicus Curiae.

## OPINION

TIMMER, Presiding Judge.

¶ 1 Recently, in *Lawrence v. Texas,* 539 U.S. 558, ——, 123 S.Ct. 2472, 2484, 156 L.Ed.2d 508 (2003), the United States Supreme Court struck a Texas statute that prohibited certain sexual activity between persons of the same sex. The Court reasoned that the statute impermissibly infringed on homosexuals' liberty interest under the Due Process Clause of the Fourteenth Amendment to the United States Constitution to engage in private, consensual sexual activity without state intervention. *Id.*

¶ 2 In the wake of *Lawrence,* we are asked to declare that Arizona's prohibition of same-sex marriages, Arizona Revised Statutes ("A.R.S.") sections 25–101(C) and –125(A) (2003), similarly violates the federal and state constitutions. For the reasons that follow, we hold that Arizona's prohibition of such state-licensed unions does not violate Petitioners' rights under either constitution. Therefore, although we accept jurisdiction of this special action, we deny relief to Petitioners.

## BACKGROUND

¶ 3 Days after the Supreme Court issued *Lawrence,* Harold Donald Standhardt and Tod Alan Keltner, homosexual men in a committed relationship, applied to the Clerk of the Superior Court of Arizona, Maricopa County, for a marriage license. The Clerk denied the application in light of A.R.S. §§ 25–101(C) and –125(A), which, respectively, prohibit marriages between persons of the

same sex and define a valid marriage as one between a man and a woman.[1]

¶4 After being turned away by the Clerk, Standhardt and Keltner petitioned this court to both compel the Clerk to issue them a marriage license and declare §§ 25-101(C) and -125(A) unconstitutional under the federal and state constitutions. In light of *Lawrence* and other authorities, Petitioners argue that these provisions violate their fundamental right to marry and their right to equal protection under the laws, both of which are guaranteed by the federal and state constitutions.

## SPECIAL ACTION JURISDICTION

■ ¶5 We accept jurisdiction over this special action because there is no equally plain, speedy or adequate remedy by appeal. Ariz. R.P. Spec. Act. 1; *Inzunza–Ortega v.Super. Ct.*, 192 Ariz. 558, 560, ¶7, 968 P.2d 631, 633 (App.1998) (accepting jurisdiction to consider special action challenge to clerk of court's refusal to file inmate complaint absent advance payment of fee). Additionally, Petitioners raise "constitutional issues of first impression and statewide importance." *Martin v. Reinstein*, 195 Ariz. 293, 300–01, ¶10, 987 P.2d 779, 786–87 (App.1999).

¶6 The State asserts that we should decline jurisdiction because Petitioners can raise their claims in a lawsuit filed with the superior court seeking declaratory and injunctive relief and then appeal any adverse ruling to this court. *See Baehr v. Lewin*, 74 Haw. 530, 536–37, 852 P.2d 44, 48–49 (1993) (addressing constitutional challenge to Hawaii's marriage laws that originated in lawsuit seeking declaratory and injunctive relief from trial court). However, requiring Petitioners to take this course of action would not assist our resolution of the contested issues. No party asserts that factual findings are necessary to decide these issues, and any appellate review of the superior court's ruling would be de novo. *Bertleson v. Sacks Tierney, P.A.*, 204 Ariz. 124, 126, ¶6, 60 P.3d 703, 705 (App.2002) (stating court reviews constitutional challenge to statute de novo). For these reasons, we exercise our discretion to accept jurisdiction.

## DISCUSSION

### I. Fundamental right

■ ¶7 Petitioners first argue that Arizona's prohibition of same-sex marriages impermissibly infringes on their right to marry each other, which, they contend, is guaranteed as a fundamental liberty interest by the due process provisions of both the Fourteenth Amendment to the United States Constitution[2] and Article 2, Section 4, of the Arizona Constitution,[3] and assured as a fundamental privacy right explicitly granted by Article 2, Section 8, of the Arizona Constitution.[4] The State responds that while Petitioners possess a fundamental right to enter opposite-sex marriages, they do not have an equivalent right to enter same-sex marriages.

■ ¶8 Whether entry in state-licensed, same-sex marriages is a constitutionally anointed "fundamental right" is a critical inquiry in deciding the viability of A.R.S. §§ 25-101(C) and -125(A). If participation in such unions is a fundamental right, we must apply a "strict scrutiny" analysis, which permits us to uphold these provisions only if they serve a compelling state interest and are narrowly tailored to achieve that interest. *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (noting substantive due process forbids government infringement on fundamental liberty interest "unless the infringement is narrowly tailored to serve a compelling state interest")

1. Section 25-101(C) provides as follows: "Marriage between persons of the same sex is void and prohibited." Section 25-125(A) defines a "valid marriage," in pertinent part, as one "contracted by a male person and a female person with a proper marriage license."

2. That clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."

3. Article 2, Section 4 provides that "[n]o person shall be deprived of life, liberty, or property without due process of law."

4. Article 2, Section 8 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."

(citation omitted); *State v. Watson*, 198 Ariz. 48, 50, 51, ¶¶ 4, 7, 6 P.3d 752, 754, 755 (App.2000) (acknowledging same test for implicated fundamental rights secured by substantive due process provision of Arizona Constitution).[5]

■ ¶ 9 If participation in such unions is not a fundamental right, we will assess the constitutionality of §§ 25–101(C) and –125(A) by using a "rational basis" analysis, which requires us to uphold these provisions if they are simply rationally related to a legitimate government interest. *Glucksberg*, 521 U.S. at 728, 117 S.Ct. 2258 (stating that unless interest is fundamental liberty interest protected by Due Process Clause, law must only be rationally related to legitimate government interests); *Large v.Super. Ct.*, 148 Ariz. 229, 237, 714 P.2d 399, 407 (1986) (using rational basis test under due process provision of Arizona Constitution); *State v. Murphy*, 117 Ariz. 57, 61, 570 P.2d 1070, 1074 (1977) (applying rational basis analysis in deciding whether statute violated Arizona's constitutional guarantee of privacy).

¶ 10 Thus, to select the appropriate methodology for resolving Petitioners' arguments, we initially determine whether Petitioners assert a constitutionally protected fundamental right under the Due Process Clauses of the federal and state constitutions or the explicit privacy provision of the Arizona Constitution.

## A. Due process

■ ¶ 11 We begin with the well-accepted premise that the substantive due process guarantee "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258. In addition to the freedoms protected in the Bill of Rights, such rights and interests are those " 'deeply rooted in this Nation's history and tradition,' ... and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " *Id.* at 720–21, 117 S.Ct. 2258 (citations omitted); *see Watson*, 198 Ariz. at 51, ¶ 8, 6 P.3d at 755. Thus, using our Nation's history, legal traditions, and practices as a guidepost, the Supreme Court has conferred fundamental-right status on the right to marry, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and the right to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).[6]

■ ¶ 12 Arizona courts have similarly construed Arizona's Due Process Clause. *See Maricopa County Juvenile Action No. JT9065297*, 181 Ariz. 69, 75, 887 P.2d 599, 605 (App.1994) (recognizing freedom to move as fundamental right "rooted in our ... state constitutional protections of fundamental liberty interests under the doctrine of substantive due process"); *Edwards v. State Bd. of Barber Exam'rs*, 72 Ariz. 108, 111, 231 P.2d 450, 451 (1951) (stating Arizona's due process

---

5. No Arizona appellate court has selected the appropriate method for assessing the viability of a law that infringes on a fundamental right protected by our constitutional privacy provision, Ariz. Const. art 2, § 8. However, neither Petitioners, the State, nor Senator Anderson suggest we apply anything other than strict scrutiny analysis. Consequently, we follow the federal model of inquiry for considering the validity of a law under the privacy interest implicitly granted by the Due Process Clause in deciding whether A.R.S. §§ 25–101(C) and –125(A) pass muster under Arizona's explicit privacy provision. *See Pool v.Super. Ct.*, 139 Ariz. 98, 108, 677 P.2d 261, 271 (1984) (acknowledging desirability of following federal precedent when interpreting state constitutional provisions that correspond to the federal constitution in order to achieve uniformity, but stating such precedent should not be followed blindly).

6. Additional fundamental liberty interests include rights to bear children, *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Carey v. Population Services Internat'l*, 431 U.S. 678, 688–89, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), direct their education and upbringing, *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), use contraception, *Eisenstadt v. Baird*, 405 U.S. 438, 453–54, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), terminate a pregnancy, *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), maintain bodily integrity, *Rochin v. California*, 342 U.S. 165, 172–73, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and refuse unwanted medical treatment, *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 278–79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). *See Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258.

provision a corollary to federal Due Process Clause). It therefore follows that fundamental rights protected by the due process provision of our state constitution are those firmly entrenched in our state's history and tradition and implicit in the concept of ordered liberty that may be, or may not be, shared with the rest of the country.

¶ 13 Neither the United States Supreme Court nor any Arizona court has explicitly recognized that the fundamental right to marry includes the freedom to choose a same-sex spouse. Petitioners argue, however, that the Court in *Lawrence* implicitly recognized such a right. We therefore turn to that case before considering whether such a right otherwise exists.

¶ 14 In *Lawrence,* the Court held that a Texas statute that prohibited certain same-gender sexual activity violated homosexuals' liberty interests protected by the Due Process Clause. —— U.S. at ——, 123 S.Ct. at 2484. To reach this decision, the Court overruled *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), which had upheld a Georgia sodomy law as applied to homosexual individuals. *Lawrence,* —— U.S. at ——, ——, 123 S.Ct. at 2477, 2484. The *Bowers* Court rejected a due process challenge to the Georgia law, reasoning in pertinent part that homosexual sodomy was not a fundamental right. *Bowers,* 478 U.S. at 191, 106 S.Ct. 2841.

¶ 15 Seventeen years later, in *Lawrence,* the Court criticized its "own failure to appreciate the extent of the liberty at stake" in *Bowers* by incorrectly focusing on the right to engage in certain sexual conduct rather than on Georgia's underlying attempt to "control a personal relationship." —— U.S. at ——, 123 S.Ct. at 2478. After deciding that the liberty afforded by the Constitution permits consensual entry in a homosexual relationship, the Court held that this freedom includes the "full right" to engage in sexual practices common to such relationships without government intervention. *Id.* at 2478, 2484. Because the Texas statute did not further a legitimate state interest that justified government intrusion in the personal and private lives of homosexuals, the Court held the provision unconstitutional. *Id.*

¶ 16 Significantly, during a discussion of cases casting doubt on the ongoing viability of *Bowers,* the Court reflected on the attributes of liberty as follows:

In *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Court reaffirmed the substantive force of the liberty protected by the Due Process Clause. The *Casey* decision again confirmed that *our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. Id.,* at 851, 112 S.Ct. 2791. In explaining the respect the Constitution demands for the autonomy of the person in making these choices, we stated as follows:

"These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Ibid.*

*Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.* The decision in *Bowers* would deny them this right.

*Id.* at 2481–82 (emphasis added). Petitioners seize on the italicized language as expressing the Court's view that persons have a fundamental liberty interest to enter same-sex marriages. We disagree with Petitioners' interpretation for three reasons.

¶ 17 First, as the State points out, elsewhere in its decision the Court explicitly stated that the case before it "[did] not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Id.* at 2484; *see also id.* at 2478 (stating liberty of persons to choose personal relationship "whether or not entitled to formal recogni-

tion in the law" should counsel against attempts to define meaning of relationship or set its boundaries "absent injury to a person or abuse of an institution the law protects"). It therefore follows that the Court did not intend by its comments to address same-sex marriages.[7]

¶ 18 Second, Petitioners mistakenly equate the "purposes" for which persons in a homosexual relationship may seek autonomy with the personal choices described in *Casey*, including the choice to marry. They do this by stitching together the italicized language from the Court's decision, *supra* ¶ 16, thereby ignoring the language quoted from *Casey* that appears amidst these words and that explains why the Constitution zealously guards an individual's right to make these choices. Because the Court's citation to "these purposes" appears immediately after the *Casey* quote, we understand the Court to refer to the reasons given in that case for affording constitutional protection to certain personal choices. In other words, "[p]ersons in a homosexual relationship may seek autonomy" to make "intimate and personal choices" that reflect "one's own concept of existence, of meaning, of the universe, and of the mystery of human life" free from government compulsion. *Id.* at 2481–82. In light of the context of the quoted discussion, the issue whether *Bowers* remained viable, and the Court's eventual holding, striking the Texas law, we view the language in question as acknowledging a homosexual person's right to define his or her own existence, and achieve the type of individual fulfillment that is a hallmark of a free society, by entering a homosexual relationship. We do not view the language as stating that such a right

includes the choice to enter a state-sanctioned, same-sex marriage.

¶ 19 Third, and finally, because other language in *Lawrence* indicates that the Court did not consider sexual conduct between same-sex partners a fundamental right, it would be illogical to interpret the quoted language as recognizing a fundamental right to enter a same-sex marriage. Specifically, the Court applied without explanation the rational basis test, rather than the strict scrutiny review utilized when fundamental rights are impinged, to hold the Texas statute unconstitutional. *Id.* at 2484 ("The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual."). Although the Court spoke of a person's liberty interest to engage in same-gender sexual relations, and described such conduct as "one element in a personal bond that is more enduring," *id.* at 2478, 2484, the Court did not declare that participation in such conduct is a fundamental right. *See id.* at 2488 (Scalia, J., dissenting). If the Court did not view such an intimate expression of the bond securing a homosexual relationship to be a fundamental right, we must reject any notion that the Court intended to confer such status on the right to secure state-sanctioned recognition of such a union.[8]

¶ 20 For the foregoing reasons, we reject Petitioners' contention that *Lawrence* establishes entry in same-sex marriages as a fundamental right. We therefore examine the fundamental right to marry to determine whether it encompasses the right to marry someone of the same gender.

---

7. As Petitioners point out, Justice Scalia, in his dissenting opinion in *Lawrence*, admonished the public to disbelieve the Court's assertion that the case did not involve whether governments must formally recognize homosexual relationships. 123 S.Ct. at 2497–98. He considered the Court's comments concerning homosexual autonomy to be "illuminating" regarding the issue of same-sex marriage. *Id.* at 2498; *but see id.* at 2487–88 (O'Connor, J., concurring) (asserting state interest in promoting marriage severable from state disapproval of same-sex relations). As explained hereafter, *infra* ¶ 18, and with due respect to Justice Scalia, we do not read the Court's comments so broadly.

8. Petitioners contended at oral argument that the Court employed the rational basis test only to demonstrate that the Texas law could not survive even the lowest level of constitutional scrutiny and did not serve as a comment on the fundamental nature of the right recognized by the Court. However, no language in the decision evidences this interpretation. Accordingly, and in light of the Court's failure to explicitly state that participation in same-gender sexual relations is a fundamental right protected by substantive due process, we are not persuaded by Petitioners' argument.

¶ 21 Petitioners argue that because the freedom to enter marriage has long been recognized as a fundamental right, *see May-nard v. Hill,* 125 U.S. 190, 205, 8 S.Ct. 723, 31 L.Ed. 654 (1888),[9] that freedom necessarily includes the right to choose a same-sex spouse. Although marriage traditionally has involved opposite-sex partners, Petitioners contend that this tradition, like others before it, must crumble under our evolving understanding of liberty. *See Lawrence,* 539 U.S. at ——, 123 S.Ct. at 2484 (explaining that "[a]s the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom"); *Moore v. City of E. Cleveland, Ohio,* 431 U.S. 494, 501, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (describing liberty interests under due process as "a rational continuum" that is built on what survives from traditions kept and traditions broken) (citation omitted).

¶ 22 To support their contention, Petitioners first rely on *Loving v. Virginia,* wherein the Court held that a Virginia law forbidding interracial marriages deprived the couple in that case of their fundamental right to marry. 388 U.S. at 12, 87 S.Ct. 1817. The Court explained that "the freedom of choice to marry [cannot] be restricted by invidious racial discrimination," but must be left to individual preference. *Id.* Thus, although historical custom supported such anti-miscegenation laws, *see* A. Leon Higginbotham, Jr., *In the Matter of Color: Race and the American Legal Process—The Colonial Period* 41–42, n. 55 (Oxford Univ. Press 1978), Virginia's law was not spared from constitutional at-

tack. *Bowers,* 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting) (adopted in *Lawrence,* 539 U.S. at —— – ——, 123 S.Ct. at 2483–84).

¶ 23 Petitioners assert that because the "freedom of choice to marry" recognized in *Loving* is unrestricted, it encompasses the right to marry anyone, including a same-sex partner, even in the face of traditional, societal disapproval of such unions. We disagree. Implicit in *Loving* and predecessor opinions is the notion that marriage, often linked to procreation, is a union forged between one man and one woman. 388 U.S. at 12, 87 S.Ct. 1817 ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") (citation omitted); *Baehr,* 74 Haw. at 552–55, 852 P.2d at 55–56 (discussing Supreme Court opinions construing fundamental right to marry and concluding right "presently contemplates unions between men and women"). Thus, while *Loving* expanded the traditional scope of the fundamental right to marry by granting interracial couples unrestricted access to the state-sanctioned marriage institution, that decision was anchored to the concept of marriage as a union involving persons of the opposite sex. In contrast, recognizing a right to marry someone of the same sex would not expand the established right to marry, but would redefine the legal meaning of "marriage." We therefore conclude that *Loving* does not mandate a conclusion that the fundamental right to choose one's spouse necessarily includes the choice to enter a same-sex marriage.[10]

---

**9.** *Maynard* is acknowledged as the first case in which the Supreme Court commented on the important place marriage holds in our society. *See Zablocki v. Redhail,* 434 U.S. 374, 384, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). The Court described marriage "as creating the most important relation in life ... having more to do with the morals and civilization of a people than any other institution." *Maynard,* 125 U.S. at 205, 8 S.Ct. 723. In the years following *Maynard,* the Court has consistently reaffirmed the importance of marriage and has explicitly recognized entry in marriage as a fundamental right. *See, e.g., Turner v. Safley,* 482 U.S. 78, 97, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (striking Missouri prison regulation prohibiting inmates from marrying without prison approval as violating prisoners' fundamental right to marry); *Zablocki,* 434 U.S. at 387, 98 S.Ct. 673 (holding Wisconsin law prohibiting person with court-ordered child sup-

port obligation from marrying without court permission "interfere[d] directly and substantially with the right to marry"); *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); *Skinner,* 316 U.S. at 541, 62 S.Ct. 1110 (acknowledging marriage as "fundamental to the very existence and survival of the race"); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (recognizing right to marry, establish home and raise children is central part of liberty protected by due process).

**10.** Petitioners' citation to other examples of traditional marital principles that have collapsed

¶ 24 Petitioners finally argue that the choice to enter a same-sex marriage must be granted fundamental-right status in view of society's evolving acceptance of same-sex unions. To demonstrate this evolution, they cite evidence of such unions in ancient times, the existence of religious liturgies for these relationships, international recognition of same-sex marriages or unions,[11] Vermont's enactment of civil union laws,[12] and the number of lawsuits pending or planned to challenge laws restricting marriage to opposite-sex couples.

¶ 25 We are mindful of the Supreme Court's admonition to "exercise the utmost care" in conferring fundamental-right status on a newly asserted interest lest we transform the liberty protected by due process into judicial policy preferences rather than principles born of public debate and legislative action. *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2258. In exercising that care, we reject Petitioners' argument.

¶ 26 Although same-sex relationships are more open and have garnered greater societal acceptance in recent years, same-sex marriages are neither deeply rooted in the legal and social history of our Nation or state nor are they implicit in the concept of ordered liberty. *Id.* at 720–21, 117 S.Ct. 2258. Despite changing attitudes about both homosexuality and the attributes of "family," no state in this Nation has enacted legislation allowing same-sex marriages. To the contrary, Congress and the majority of states, including Arizona, have enacted legislation in recent years explicitly limiting marriage to opposite-sex unions.[13]

¶ 27 This court does not dispute that a homosexual person's choice of life partner is an intimate and important decision. However, not all important decisions

over time similarly do not persuade us that the fundamental right to marry includes the freedom to choose a same-sex spouse. *See, e.g., Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 141, 21 L.Ed. 442 (1872) (Bradley, J., concurring) (recognizing married woman could not enter a contract without husband's permission); *Joyner v. Joyner*, 59 N.C. (6 Jones Eq.) 322, 325 (1862) ("It follows that the law gives the husband power to use such a degree of force as is necessary to make the wife behave herself and know her place."). These shifts in principles governing marriage have involved aspects of the marital relationship that are extrinsic to its core meaning: the legal union between one man and one woman.

11. Courts in two Canadian provinces recently declared that confinement of marriage to opposite-sex couples violates the Canadian Charter of Rights and Freedoms. *See Halpern v. Toronto*, [2003] CarswellOnt 2159, 172 O.A.C. 276; *EGALE Canada, Inc. v. Canada*, [2003] CarswellBC 1659, 15 B.C.L.R.4th 226. Additionally, in 2001, the Netherlands enacted legislation allowing same-sex couples to marry. *See* Wet wan 21 december 2000, Stb.2001, nr. 9 (Neth.) (providing for the "Opening up of Marriage for Same Sex Partners"). Earlier this year, Belgium also legalized same-sex marriages. *See* Moniteur Belge, Feb. 28, 2003, Ed. 3, pp. 9880–82 (Belg.) ("Law of 13 February 2003 opening up marriage to persons of the same sex and modifying certain provisions of the Civil Code"). Denmark, Norway, Sweden, Iceland, and Finland allow same-sex couples to register partnerships, which have the same legal effect as opposite-sex marriages. *See Inching Down the Aisle: Differing Paths Towards the Legalization of Same–Sex Marriage in the U.S. & Europe*, 116 Harv. L.Rev.2004, 2004–

05, 2008 (May 2003). Hungary, Germany, France, and Portugal have laws providing benefits to same-sex couples. *See id.*

12. *See* Vt. Stat. Ann. tit. 15, §§ 1201–1207 (Supp. 2001) (establishing civil unions for same-sex couples in order to provide them with the same benefits and protections afforded married opposite-sex couples as required by state constitutional provision). *See also Baker v. State*, 170 Vt. 194, 225–26, 744 A.2d 864, 887 (1999) (requiring Vermont legislature to enact legislation granting qualified same-sex couples the benefits and protections afforded married opposite-sex couples).

13. In 1996, Congress passed the Defense of Marriage Act, Pub.L. No. 104–199, 110 Stat. 2419 (1996), which provides, in pertinent part, that "marriage" as used in federal law refers to a legal union between one man and one woman, 1 U.S.C. § 7 (1997), and that states are not required to recognize same-sex marriages valid under the laws of another state, 28 U.S.C. § 1738C (Supp.2003). That same year, the Arizona legislature enacted A.R.S. § 25–101(C), which provides that same-sex marriages are void. 1996 Ariz. Sess. Laws, ch. 348, § 1. Simultaneously, the legislature enacted A.R.S. §§ 25–112(A) and –112(B) (2000), which state that Arizona will not recognize such marriages if contracted in another state or country. 1996 Ariz. Sess. Laws, ch. 348, § 2. Since 1995, thirty-five other states have enacted similar laws or have amended their constitutions in this manner. Nev. Const. art. I, § 21; William C. Duncan, *Whither Marriage in the Law?*, 15 Regent U.L.Rev. 119, 120–21, nn. 9–11 (2002–03) (collecting thirty-four provisions).

sounding in personal autonomy are protected fundamental rights. *Id.* at 727–28, 117 S.Ct. 2258 ("That many of the rights and liberties protected by the Due Process Clause sound in personal autonomy does not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected."). The history of the law's treatment of marriage as an institution involving one man and one woman, together with recent, explicit reaffirmations of that view, lead invariably to the conclusion that the right to enter a same-sex marriage is not a fundamental liberty interest protected by due process.[14]

**B. Arizona's explicit privacy provision**

¶ 28 Petitioners next argue that the explicit privacy provision in our constitution, Ariz. Const. art. 2, § 8, confers a fundamental right to enter a same-sex marriage. They rely on cases holding that Arizona's privacy provision bestows greater rights than the federal constitution in the areas of medical treatment and search and seizure. *Rasmussen v. Fleming,* 154 Ariz. 207, 215, 741 P.2d 674, 682 (1987) (applying privacy guarantee to decide that an individual in a chronic vegetative state had a right, through a guardian, to refuse treatment and choose death); *Simat Corp. v. Ariz. Health Care Cost Containment Sys.,* 203 Ariz. 454, 458 n. 2, ¶ 13, 56 P.3d 28, 32 n. 2 (2002) (commenting that right described in *Rasmussen* not recognized under federal constitution); *State v. Bolt,* 142 Ariz. 260, 264–65, 689 P.2d 519, 523–24 (1984) (holding Arizona's privacy provision bestows greater privacy rights in a person's home than Fourth Amendment). Petitioners fail to explain, however, why the greater rights afforded by our privacy provision in two, unrelated areas of the law compel a conclusion that the provision also affords greater rights under our marriage laws. We do not perceive such a connection.

¶ 29 First, although the records of Arizona's 1910 constitutional convention do not reflect the framers' intent in adopting the privacy provision, *Hart v. Seven Resorts Inc.,* 190 Ariz. 272, 277, 947 P.2d 846, 851 (App. 1997), it is unlikely the framers intended to confer a right to enter a same-sex marriage. *See Empress Adult Video and Bookstore v. City of Tucson,* 204 Ariz. 50, 55, ¶ 5, 59 P.3d 814, 819 (App.2002) (acknowledging that in interpreting the constitution the courts must ascertain and effectuate the intent of the framers). "Marriage" at that time was commonly defined as a civil status existing between one man and one woman. *Dean,* 653 A.2d at 315 (citing Black's Law Dictionary 762 (2d ed.1910)).

¶ 30 Second, the existence of greater privacy rights under the state constitution in the areas of individual health care and home searches does not compel a conclusion that the privacy provision also imparts greater rights in the choice of marriage partner. Affording greater privacy rights in the propriety of an individual's medical decisions and in home searches militates against government intrusions. Neither situation involves requiring the state to affirmatively involve itself in a relationship, as is the case with marriage. *See Forsythe v. Paschal,* 34 Ariz. 380, 384, 271 P. 865, 866 (1928) (describing "marriage" as a status created by contract in which the state becomes an interested party).

¶ 31 For these reasons, we decide that the privacy provision in the Arizona Constitution does not afford greater rights in marriage than those conferred by the federal and state due process provisions. Because Petitioners do not have a fundamental right to enter a same-sex marriage under those provisions, they similarly lack a fundamental right under Arizona's explicit privacy provision.

**C. Rational basis review**

¶ 32 Because Petitioners do not have a fundamental right to enter a same-sex marriage, we review the constitutionality of A.R.S. §§ 25–101(C) and –125(A) using the

---

14. Other courts that have considered the issue have reached the same conclusion. *See Dean v. District of Columbia,* 653 A.2d 307, 333 (App. D.C.1995); *Baehr,* 74 Haw. at 556–57, 852 P.2d at 57; *Jones v. Hallahan,* 501 S.W.2d 588, 590 (Ky.1973); *Baker v. Nelson,* 291 Minn. 310, 312, 191 N.W.2d 185, 186 (1971). We are not aware of any published decision in the United States concluding that individuals possess a fundamental right to enter same-sex marriages.

rational basis analysis. *See supra* ¶ 9. We presume the prohibition is constitutional and will uphold it if there is "a reasonable, even though debatable, basis for [its] enactment." *Murphy,* 117 Ariz. at 61, 570 P.2d at 1074; *see also Big D Constr. Corp. v. Court of Appeals,* 163 Ariz. 560, 566, 789 P.2d 1061, 1067 (1990) ("To withstand scrutiny [under the rational basis test], however, the statute must not be arbitrary or irrational ...."). Petitioners bear the burden of proving that Arizona's prohibition of same-sex marriages is not rationally related to any conceivable legitimate state interest. *Glucksberg,* 521 U.S. at 728, 117 S.Ct. 2258; *Watson,* 198 Ariz. at 52–53, ¶ 12, 6 P.3d at 756–57; *Church v. Rawson Drug & Sundry Co.,* 173 Ariz. 342, 350, 842 P.2d 1355, 1363 (App. 1992).

¶ 33 The State contends it has a legitimate interest in encouraging procreation and child-rearing within the stable environment traditionally associated with marriage, and that limiting marriage to opposite-sex couples is rationally related to that interest. Essentially, the State asserts that by legally sanctioning a heterosexual relationship through marriage, thereby imposing both obligations and benefits on the couple and inserting the State in the relationship, the State communicates to parents and prospective parents that their long-term, committed relationships are uniquely important as a public concern. *See Moran v. Moran,* 188 Ariz. 139, 144, 933 P.2d 1207, 1212 (App. 1996) (describing marriage as relationship with which State vitally concerned "for it is the foundation of the family and of society, without which there would be neither civilization nor progress") (citation omitted); *Soos v.Super. Ct.,* 182 Ariz. 470, 474, 897 P.2d 1356, 1360 (App.1994) ("Marriage and procreation are fundamental to the very existence and survival of the race.") (quoting *Skinner,* 316 U.S. at 541, 62 S.Ct. 1110); *see also Jackson v. Tangreen,* 199 Ariz. 306, 313, ¶ 27, 18 P.3d 100, 107 (App.2000) (recognizing State has legitimate interest in "promoting healthy family relationships that enable children to become well-adjusted, responsible adults") (citation omitted). Because the State's interest in committed sexual relationships is limited to those capable of producing children, it contends it reasonably restricts marriage to opposite-sex couples.[15]

¶ 34 Petitioners argue that the State's asserted basis for restricting marriage to opposite-sex couples is not rationally related to a legitimate state interest for several reasons, which we address in turn. First, Petitioners briefly contend that a state's interest in procreation and protecting children can never justify a law infringing upon the right to marry, because the Supreme Court has stated that the right to marry belongs to individuals rather than families or society. *See Griswold,* 381 U.S. at 486, 85 S.Ct. 1678 (striking state law banning distribution of condoms to married couples and describing marriage, in part, as "a bilateral loyalty, not [a] commercial or social project[ ]"); *Loving,* 388 U.S. at 12, 87 S.Ct. 1817 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."). Although *Griswold* and *Loving* described marriage as a personal right, neither case

---

**15.** This position has support among courts and commentators. *See Adams v. Howerton,* 486 F.Supp. 1119, 1124–25 (C.D.Cal.1980) (rejecting contention that same-sex couples can marry and holding state has "interest in encouraging and fostering procreation of the race and providing status and stability to the environment in which children are raised"), *aff'd,* 673 F.2d 1036 (9th Cir.1982); *Singer v. Hara,* 11 Wash.App. 247, 259–60, 522 P.2d 1187, 1195 (1974) ("[M]arriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race."); H.R.Rep. No. 104–664, at 14 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2918 ("Were it not for the possibility of begetting children inherent in heterosexual unions, society would have no particular interest in encouraging citizens to come together in a committed relationship."); Maggie Gallagher, *What Is Marriage For? The Public Purposes of Marriage Law,* 62 La. L.Rev. 773, 782 (2002) ("The public legal union of a man and woman is designed first and foremost to protect the children that their sexual union (and that type of sexual union alone) regularly produces."); Lynn D. Wardle, *"Multiply and Replenish": Considering Same–Sex Marriage in Light of State Interests in Marital Procreation,* 24 Harv. J.L. & Pub. Pol'y 771, 792 (2001) ("Traditional marriage facilitates procreation by increasing the relational commitment, complementarity, and stability needed for the long term responsibilities that result from procreation.").

suggested that a state cannot infringe upon that right for social purposes, such as encouraging procreation and protecting children. Indeed, the Court recognized in *Loving* that "marriage is a social relation subject to the State's police power." 388 U.S. at 7, 87 S.Ct. 1817. We therefore reject Petitioners' contention.

¶ 35 Petitioners more persuasively argue that the State's attempt to link marriage to procreation and child-rearing is not reasonable because (1) opposite-sex couples are not required to procreate in order to marry, and (2) same-sex couples also raise children, who would benefit from the stability provided by marriage within the family.[16] However, as the State notes, "[a] perfect fit is not required" under the rational basis test, and we will not overturn a statute "merely because it is not made with 'mathematical nicety, or because in practice it results in some inequality.' " *Big D Constr. Corp.*, 163 Ariz. at 566, 789 P.2d at 1067 (citations omitted).

¶ 36 Allowing all opposite-sex couples to enter marriage under Arizona law, regardless of their willingness or ability to procreate, does not defeat the reasonableness of the link between opposite-sex marriage, procreation, and child-rearing. First, if the State excluded opposite-sex couples from marriage based on their intention or ability to procreate, the State would have to inquire about that subject before issuing a license, thereby implicating constitutionally rooted privacy concerns. *See Griswold*, 381 U.S. at 485–86, 85 S.Ct. 1678; *Eisenstadt*, 405 U.S. at 453–54, 92 S.Ct. 1029; *Adams*, 486 F.Supp. at 1124–25 (recognizing government inquiry about couples' procreation plans or requiring sterility tests before issuing marriage licenses would "raise serious constitutional questions"). Second, in light of medical advances affecting sterility, the ability to adopt, and the fact that intentionally childless couples may eventually choose to have a child or have an unplanned pregnancy, the State would have a difficult, if not impossible, task in identifying couples who will never bear and/or raise children. Third, because opposite-sex couples have a fundamental right to marry, *Loving*, 388 U.S. at 12, 87 S.Ct. 1817, excluding such couples from marriage could only be justified by a compelling state interest, narrowly tailored to achieve that interest, *Glucksberg*, 521 U.S. at 721, 117 S.Ct. 2258, which is not readily apparent.

¶ 37 For these reasons, the State's decision to permit all qualified opposite-sex couples to marry does not defeat the reasonableness of the link between opposite-sex marriage, procreation, and child-rearing. *See Adams*, 486 F.Supp. at 1124–25 (rejecting challenge to same-sex marriage prohibition on basis that opposite-sex couples not required to prove or declare willingness to procreate in order to marry); *Baker*, 291 Minn. at 313–14, 191 N.W.2d at 187 (same).

¶ 38 Likewise, although some same-sex couples also raise children, exclusion of these couples from the marriage relationship does not defeat the reasonableness of the link between opposite-sex marriage, procreation, and child-rearing. Indisputably, the only sexual relationship capable of producing children is one between a man and a woman. The State could reasonably decide that by encouraging opposite-sex couples to marry,

---

**16.** Justice Scalia's dissenting comments in *Lawrence* support Petitioners' argument. 123 S.Ct. at 2498 (questioning justification for prohibiting same-sex marriages in light of Court's holding and observing that encouraging procreation would not suffice "since the sterile and the elderly are allowed to marry"). Petitioners' position is also supported by the Vermont Supreme Court's decision in *Baker*, which led to the adoption of Vermont's civil union laws, Vt. Stat. Ann. tit. 15, §§ 1201–1207, but did not grant "marriage" rights to same-sex couples. 170 Vt. at 222, 224–25, 744 A.2d at 884–85, 886 (rejecting argument that excluding same-sex couples from marriage is reasonable to promote child-rearing in setting with both male and female role models and holding prohibition violates Vermont Constitution common benefits clause). Additionally, commentators support Petitioners' position. *See, e.g.*, David L. Chambers, *What If? The Legal Consequences of Marriage and the Legal Needs of Lesbian and Gay Male Couples*, 95 Mich. L.Rev. 447, 461 (Nov.1996) ("The laws that advantage married couples are needed by some heterosexual married couples who wish to raise children, but these same laws would be helpful to almost all lesbian and gay male couples who wish to raise a child as legal equals because, for them, it is always the case that neither partner or only one is the biological parent of the child."); *see also Inching Down the Aisle, supra* note 11.

thereby assuming legal and financial obligations, the children born from such relationships will have better opportunities to be nurtured and raised by two parents within long-term, committed relationships, which society has traditionally viewed as advantageous for children. Because same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships.

¶ 39 Children raised in families headed by a same-sex couple deserve and benefit from bilateral parenting within long-term, committed relationships just as much as children with married parents. Thus, children in same-sex families could benefit from the stability offered by same-sex marriage, particularly if such children do not have ties with both biological parents. But although the line drawn between couples who may marry (opposite-sex) and those who may not (same-sex) may result in some inequity for children raised by same-sex couples, such inequity is insufficient to negate the State's link between opposite-sex marriage, procreation, and child-rearing. *See Big D Constr. Corp.*, 163 Ariz. at 566, 789 P.2d at 1067; *see also Baker*, 170 Vt. at 219, 744 A.2d at 882 ("It is, of course, well settled that statutes are not necessarily unconstitutional because they fail

to extend legal protection to all who are similarly situated."). The fact that the line could be drawn differently is a matter for legislative, rather than judicial, consideration, as long as plausible reasons exist for placement of the current line. *Fed. Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313–14, 315–16, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Any inequity must be addressed and remedied by the legislature.[17] *Id.* at 316, 113 S.Ct. 2096.

¶ 40 Petitioners lastly argue that the State's limitation of marriage to opposite-sex unions is not reasonably related to its interests in procreation, because excluding same-sex couples from the marriage relationship does not impact procreation. We agree with Petitioners that allowing same-sex couples to marry would not inhibit opposite-sex couples from procreating. But the reasonableness of the State's position is not dependent on the contrary conclusion. Rather, as previously explained, *supra* ¶ 38, the State does not have the same interest in sanctioning marriages between couples who are incapable of procreating as it does with opposite-sex couples. We therefore reject Petitioners' argument.

¶ 41 In summary, Petitioners have failed to prove that the State's prohibition of same-sex marriage is not rationally related to a legitimate state interest. We hold that the State has a legitimate interest in encouraging pro-

---

**17.** Many state and city governments have commenced the process of examining and ameliorating perceived inequities imposed on same-sex couples and their families stemming from the prohibition of same-sex marriage. For example, in Vermont, same-sex couples can legally adopt and rear children and have ongoing parental rights after termination of a domestic partnership. Vermont and California have each adopted domestic partner acts providing benefits and imposing obligations on registered same-sex couples concerning, among other things, rights in property, employment, insurance, child custody, and hospital visitation. Vt. Stat. Ann. tit. 15, §§ 1201–1207 (establishing "civil unions"); Vt. Stat. Ann. tit. 15A, §§ 1–102(b), –112 (2002) (adoption and custody); Cal. Fam.Code §§ 297–299.6 (West Supp.2003) (establishing "domestic partnerships"); Assemb. B. 205, 2003–04 Gen. Assemb., Reg. Sess. (Cal.2003) (expanding rights and obligations for same-sex couples effective January 1, 2005). In addition, Washington, Oregon, Hawaii, New York, Massachusetts, and Connecticut offer domestic partner benefits for state

employees, while the cities of Phoenix and Tucson, among others, offer similar benefits to their employees. Lambda Legal, *Government Employers Offering Domestic Partner Benefits*, available at http: //www.lambdalegal.org/cgi-bin/iowa/states/domesticpart-map (last visited Oct. 3, 2003); *see also* Principles of the Law of Family Dissolution: Analysis and Recommendations §§ 6.03–.06 (A.L.I.2002) (recommending recognition of same-sex partnerships and affording many rights and obligations imposed by marriages). Moreover, the City of Tucson recently adopted the "Tucson Domestic Partnership Ordinance," Tucson, Ariz., City Ordinances ch. 17, art. IX, §§ 17–70 to –77 (2003) (eff.Dec. 1, 2003), permitting same-sex couples to register their status with the city. The chief benefits of registration will be to ensure hospital visitation privileges for same-sex couples and to extend to them family discounts offered by city businesses. Id. at § 17–76; see also Cook County, Ill., County Ordinance 03–O–18 (July 1, 2003) (creating "Domestic Partnership Registry").

creation and child-rearing within the marital relationship, and that limiting marriage to opposite-sex couples is rationally related to that interest. Even assuming that the State's reasoning for prohibiting same-sex marriages is debatable, *see Murphy*, 117 Ariz. at 61, 570 P.2d at 1074, or arguably unwise, *see Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), it is not "arbitrary or irrational," *see Big D Constr. Corp.*, 163 Ariz. at 566, 789 P.2d at 1067. Consequently, A.R.S. §§ 25–101(C) and –125(A) do not violate Petitioners' substantive due process or explicit privacy rights and must be upheld.

## II. Equal protection

■ ¶ 42 Petitioners finally argue that A.R.S. §§ 25–101(C) and –125(A) deprive them of the equal protection of laws as guaranteed by both the federal [18] and state [19] constitutions. Essentially, Petitioners contend that the State violated their rights to equal protection by granting marriage benefits to one class of persons, opposite-sex couples, while denying those benefits to another class of persons, same-sex couples.

■ ¶ 43 It is well-established that legislation may discriminate among classes as long as the burden imposed on the affected class is justifiable. *Simat*, 203 Ariz. at 458, ¶ 15, 56 P.3d at 32. One of three levels of scrutiny is applied by the courts to determine whether sufficient justification exists: rational basis analysis, intermediate scrutiny, or strict scrutiny. *Id.*

■ ¶ 44 The rational basis analysis is substantially similar to the analysis employed to determine whether a law violates an individual's liberty interest guaranteed by substantive due process. *Watson*, 198 Ariz. at 51 n. 1, ¶ 7, 6 P.3d at 755 n. 1. Thus, a law that disparately treats an affected class is presumptively constitutional and will be upheld if the classification rationally furthers a legitimate state interest. *Romer v. Evans*, 517 U.S. 620, 632–33, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996); *Simat*, 203 Ariz. at 458, ¶ 15, 56 P.3d at 32. This analysis is employed in the usual case. *Simat*, 203 Ariz. at 458, ¶ 15, 56 P.3d at 32.

■ ¶ 45 An intermediate level of scrutiny is used for laws that discriminate against quasi-suspect classifications such as those based on gender and illegitimacy of birth. *Id.* To uphold a statute under this test, a court must conclude that the interest served by the law is important and the means used to achieve the government's goal are reasonable. *Id.* Finally, when the challenged law affects a fundamental right or discriminates against a "suspect class," such as one based on race or national origin, we apply a strict scrutiny analysis and will uphold the law only if it is necessary to further a compelling government interest and is narrowly tailored to achieve the legislative objective. *Id.*

■ ¶ 46 Petitioners do not argue that homosexuals are a quasi-suspect or suspect class. Rather, they contend that because Arizona's prohibition of same-sex marriages impinges the fundamental right to marry, we must apply strict scrutiny analysis and strike A.R.S. §§ 25–101(C) and –125(A) because they do not serve a compelling state interest. As previously explained, *supra* ¶¶ 14–31, Petitioners do not have a fundamental right to marry each other. Thus, we evaluate Petitioners' equal protection arguments using the rational basis analysis rather than applying the strict scrutiny standard.

¶ 47 Petitioners contend that the State's purpose in prohibiting same-sex marriages is to "single out gay persons to impose a particular disability on them," which cannot serve a legitimate state objective for the reasons explained in *Romer v. Evans*. In *Romer*, the Court addressed an equal protection chal-

18. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."

19. The Equal Privileges and Immunities Clause in the Arizona Constitution provides that "[n]o law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations." Ariz. Const. art. 2, § 13. We have held that this clause provides the same benefits as its federal counterpart, *Empress Adult Video & Bookstore*, 204 Ariz. at 64, ¶ 36, 59 P.3d at 828, and Petitioners do not argue otherwise.

lenge to Colorado's "Amendment 2" to its constitution, which prohibited all legislative, executive, or judicial action designed to protect homosexual persons from discrimination. 517 U.S. at 624, 116 S.Ct. 1620. The Court held that Amendment 2 did not bear a rational relation to a legitimate end due to its "peculiar property of imposing a broad and undifferentiated disability on a single named group," with a breadth "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." *Id.* at 632, 116 S.Ct. 1620.

¶ 48 In contrast to Amendment 2, A.R.S. §§ 25–101(C) and –125(A) are not so exceptional and unduly broad as to render the State's reasons for their enactment "inexplicable by anything but animus" towards Arizona's homosexual residents. Arizona's prohibition of same-sex marriages furthers a proper legislative end and was not enacted simply to make same-sex couples unequal to everyone else. *Cf. Romer,* 517 U.S. at 635, 116 S.Ct. 1620 (concluding that "Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else"). Consequently, we reject Petitioners' equal protection challenge to A.R.S. §§ 25–101(C) and –125(A).

## CONCLUSION

¶ 49 For the foregoing reasons, we hold that the fundamental right to marry protected by our federal and state constitutions does not encompass the right to marry a same-sex partner. Moreover, although many traditional views of homosexuality have been recast over time in our state and Nation, the choice to marry a same-sex partner has not taken sufficient root to receive constitutional protection as a fundamental right. Because Arizona's prohibition against same-sex marriage rationally furthers a legitimate state interest, we further decide that the prohibition does not deprive Petitioners of their constitutional rights to substantive due process, privacy, or equal protection of the laws. Consequently, it is for the people of Arizona, through their elected representatives or by using the initiative process, rather than this court, to decide whether to permit same-sex

marriages. Having accepted jurisdiction of this special action, we deny relief.

CONCURRING: JOHN C. GEMMILL and MAURICE PORTLEY, JJ.