Darrin B. Derosia Informal Opinion Corporation Counsel No. 2004-1 City of Cohoes City Hall 97 Mohawk Street Cohoes, New York 12047-2897 Peter Case Graham Town Attorney Town of Olive 479 Washington Avenue Kingston, New York 12401
Dear Mr. Derosia and Mr. Graham:
You each have written to our office regarding the issue of same-sex marriages. In particular, the Town of Olive has asked whether the Town Clerk may "issue a marriage license to two persons who claim to be of the same sex." The City of Cohoes has asked whether "there [are] any circumstances under which same sex marriage would be valid in New York State, and if so, what are those circumstances?" During the past several weeks, our office has also received related inquiries from other elected officials.
In view of the significant public interest in this matter, we have expedited our review and are issuing this opinion to address certain legal questions regarding the scope and meaning of the New York Domestic Relations Law ("DRL"). The Attorney General's Office traditionally does not issue opinions on the constitutionality of state laws, and we do not today opine on whether the federal or state constitutions require the State to permit same-sex marriage. New York courts have not yet ruled on this issue, and they are the proper forum for resolution of this matter. However, because these constitutional concerns are integral to the questions you raise, we outline them here to assist you in advising the local officials you represent.
A. Overview of the Domestic Relations Law
The Domestic Relations Law provides the statutory framework for marriage, including identifying those marriages deemed void and voidable (Article 2); setting forth the requirements for solemnization, issuance of marriage licenses, and proof of eligibility for marriage (Article 3); and providing for annulment and voidability of marriages (Article 9), and for divorce, separation, and dissolution on grounds of absence (Articles 10 — 12).
1. Formal Requirements for Marriage
a. Qualifications for Marriage
The DRL sets forth only two qualifications for marriage: (1) a minimum age requirement, see DRL § 15-a; and (2) "the consent of parties capable in law of making a contract," id. § 10.
Article 2 defines those relationships that constitute "void" or "voidable" marriages. Specifically, incestuous and bigamous marriages are void. See id. §§ 5, 6. That is, such unions are void from their inception, and no judgment or other judicial action is required to make it so. See McCullen v. McCullen, 162 A.D. 599, 601 (1st Dep't 1914). Certain other marriages are "voidable," i.e., void only if so "declared by a court of competent jurisdiction." DRL § 7. Voidable marriages include those in which either party is under eighteen years old, _seeid. § 7(1); cannot consent to the marriage "for want of understanding," id. § 7(2); cannot enter "into the married state from physical cause," id. § 7(3); consents to the marriage "by reason of force, duress or fraud," id. § 7(4); or has been "incurably mentally ill for a period of five years or more," id. § 7(5).
b. Licensure and Solemnization
Article 3 sets forth the formal requirements for marriage, which include licensure and solemnization. The DRL requires that "all persons intended to be married in New York state . . . obtain a marriage license from a town or city clerk," and deliver the license within sixty days "to the clergyman or magistrate who is to officiate before the marriage ceremony may be performed." DRL § 13. In the case of a marriage by written contract, the license must be delivered to the judge "before whom the acknowledgment is to be taken." Id. Town or city clerks are "empowered to issue marriage licenses to any parties applying for the same who may be entitled under the laws of this state to apply therefor and to contract matrimony." Id. § 14.
In order to be valid, a marriage must be solemnized by an individual who falls within one of the categories enumerated in the statute. Persons who may solemnize marriages include ministers, clergy, mayors, county executives, and federal and state judges. See id. § 11.
Persons who solemnize a marriage in the absence of a marriage license or with knowledge that either party is legally incompetent to contract marriage may be subject to prosecution for a misdemeanor, as may a clerk who issues or files a marriage license improperly. See DRL § 17 (misdemeanor to solemnize marriage where parties have not presented license or with knowledge that either party is legally incompetent to contract matrimony); id. § 22 (misdemeanor for city or town clerk to violate DRL art. 3); Penal Law § 255.00 (misdemeanor to solemnize marriage without statutory authorization, or, if authorized to do so, to perform a marriage knowing that a legal impediment to the marriage exists).[1]
The DRL does not, however, penalize individuals who participate in a marriage ceremony without first obtaining a license. But see DRL § 16 (providing that any person who "wilfully and falsely" swears in regard to "any material fact as to the competency of any person for whose marriage the license in question or concerning the procuring or issuing of which such affidavit or statement may be made shall be deemed guilty of perjury"); see also Penal Law art. 210 (perjury).
Nor does the lack of a marriage license affect the validity of a marriage. See DRL § 25 ("Nothing in this article contained shall be construed to render void by reason of failure to procure a marriage license any marriage solemnized between persons of full age."); see alsoPersad v. Balram, 187 Misc.2d 711, 714 (Sup.Ct. Queens County 2001);Berenson v. Berenson, 198 Misc. 398 (Fam.Ct. N.Y. County 1950); Hellerv. Heller, 188 Misc. 608 (Sup.Ct., Special Term, N.Y. County 1947); In reEstate of Levy, 168 Misc. 864 (Sur. Ct. N.Y. County 1938).
2. Annulment and Divorce
Section 140 of the DRL provides for judgments declaring the nullity of void marriages, and for judgments annulling voidable marriages. An action to declare the nullity of a void marriage, while not necessary to terminate the marriage, is often brought to provide the parties with certainty about its status. See Alan D. Scheinkman, Practice Commentaries to DRL § 140, 14 McKinney's Cons. Laws of N.Y. at 332 (1999). A bigamous marriage, which is void pursuant to section 6 of the DRL, may be declared null in an action maintained by either party to the marriage or "by the former husband or wife." DRL § 140(a). Actions to annul one of the voidable marriages enumerated in section 7 of the DRL may be brought by one of the parties to the marriage, or in some instances by a parent, guardian, or relative of a party to the marriage,see id. § 140(b)-(d), and actions for divorce or separation may be brought "by a husband or wife," id. §§ 170, 200.
B. Application of Statutory Provisions to Same Sex Couples
We can provide no certain guidance as to how New York courts will ultimately rule with respect to whether New York law permits or prohibits marriage by same-sex couples. Although the DRL does not explicitly prohibit same-sex marriages, it is our view that the Legislature did not intend to authorize same-sex marriage. The exclusion of same-sex couples from eligibility for marriage, however, presents serious constitutional concerns, which we outline below.
We also address whether, as a matter of New York's longstanding common-law rule of recognition, New York courts must recognize the spousal status of parties to same-sex unions performed in other jurisdictions. Our view is consistent with that of the only New York court to have addressed the issue, which held that parties to Vermont civil unions must be treated as "spouses" for purposes of the Estates, Powers, and Trusts Law ("EPTL").
1. Statutory Language
While the text of the DRL does not expressly bar marriage of same-sex couples, the inclusion in the DRL of gender-specific terms to describe parties to a marriage, as well as the historical context of its enactment, indicates that the Legislature did not intend to authorize same-sex marriage.
The DRL includes no express requirement that married persons be of the opposite sex. Nor does it declare invalid marriages between persons of the same sex; the provisions enumerating marriages that are "absolutely void" or "voidable" make no mention of same-sex marriage.See DRL §§ 5-7.[2] In the absence of an explicit prohibition against same-sex marriage, canons of statutory construction instruct that "courts [should not] correct supposed . . . omissions or defects in legislation." Statutes § 73, 1 McKinney's Cons. Laws of N.Y. at 147-48 (1971).
But notwithstanding the lack of any explicit bar on same-sex marriage, the historical context of the DRL's enactment suggests that the Legislature intended only to authorize marriage between persons of the opposite sex. At the time of the DRL's initial enactment in 1896 and its amendment in 1907 to provide for marriage licenses, the statute referred to marriage in gender — specific terms. See Act of April 17, 1896, Ch. 272, 1896 N.Y. Laws Vol. 1, 216-22; Act of July 26, 1907, Ch. 742, 1907 N.Y. laws Vol. 2, 1744-45. While the legislative history of the relevant DRL provisions does not address same-sex marriage, that silence is presumably due to the apparent lack of any practice of same-sex marriage at the time of enactment and amendment. In general, "the literal meaning of the words used must yield when necessary to give effect to the intention of the Legislature." Statutes § 111, 1 McKinney's Cons. Laws of N.Y. at 225 (1971). Accordingly, even absent an express prohibition, courts could read such a restriction into the DRL to give effect to the Legislature's apparent intent.
The inclusion of gender-specific references to married persons in the DRL is consistent with this conclusion. For example, section 15(1)(a) of the DRL requires the town or city clerk to obtain certain information from the "groom" and the "bride." Another provision requires that the parties to a marriage "solemnly declare . . . that they take each other as husband and wife." DRL § 12; see also id. § 5 (voiding marriage between "brother and sister" or between "[a]n uncle and niece or an aunt and nephew"); id. § 6 (voiding marriage contracted by "a person whose husband or wife by a former marriage is living," unless certain conditions exist); id. § 200 (action for separation "may be maintained by a husband or wife"); id. § 221 (a petition for dissolution on the ground of absence "shall allege that the husband or wife of such party has absented himself or herself for five successive years"); id. § 248 (directing manner for modifying final judgment in action for divorce, annulment or declaration of nullity upon "application of the husband" and proof of marriage "of the wife"); cf. CPLR §4502(b) ("A husband or wife shall not be required, or, without consent of the other if living, allowed, to disclose a confidential communication made by one to the other during marriage.")
The DRL does also refer to married persons in gender-neutral terms. Several provisions mention the "party" or "parties" to a marriage. See,e.g., DRL § 7 ("either party"); id. § 8 ("either party"); id. § 11(4) (authorizing solemnization by written contract of marriage signed by, inter alia, "both parties"); id. § 11(5) ("where either or both of the parties is under the age of eighteen years"); id. § 11-a(1)(b) (referring to "persons to whom the city clerk of any such city of the first class shall have issued a marriage license"); id. § 13 ("either party to the marriage"); id. § 15-a ("either party"). It is our view, however, that these references are not sufficient to suggest a legislative intent to authorize same-sex marriage, in light of other evidence to the contrary.
The decisions of courts in other states with statutes that lack an express prohibition of same-sex marriage accord with our construction of New York's DRL. For example, Massachusetts' highest court held that the state's marriage statute did not allow same-sex marriage because the everyday definition of the word "marriage" is "`the legal union of a man and woman as husband and wife.'" Goodridge v. Department of Pub.Health, 798 N.E.2d 941, 952 (Mass. 2003) (quoting Black's Law Dictionary
986 (7th ed. 1999)). The court noted that this definition derived from the common law, to which Massachusetts courts turn for guidance regarding the validity of marriages when the statutes are silent. See id. at 952. The court also looked to the statute's consanguinity provisions since they used gender- specific terms. See id. at 953; see also Singer v.Hara, 522 P.2d 1187, 1189 (Wash.Ct.App. 1974) (citing provision of the Washington marriage statute referencing "the male" and "the female" to "dispel any suggestion that the legislature intended to authorize same-sex marriages"); Baker v. Nelson, 191 N.W.2d 185, 186 (Minn. 1971) (Minnesota marriage statute did not authorize same-sex marriage because the "common usage" of "marriage" means "union between persons of the opposite sex" and the statute used words of "heterosexual import" such as "husband and wife" and "bride and groom").
2. New York Decisional Law
While New York's highest court has not spoken definitively on the question of whether the DRL authorizes or prohibits same- sex marriage,[3]
existing New York precedent is consistent with our view that the DRL does not authorize same-sex marriage. This precedent, however, does not squarely address the questions you raise, nor does it confront the constitutional considerations we identify below.
Several state courts have stated that same-sex marriage is not permitted in New York. For example, in Anonymous v. Anonymous,67 Misc.2d 982 (Sup.Ct. Queens County 1971), the plaintiff sought a declaration of his marital status with the defendant, who was not a female at the time of the marriage ceremony. See id. at 983-84. The court held that the marriage ceremony did not create a legal relationship between them because one of the "two basic requirements for a marriage contract, i.e., a man and a woman . . . was missing." Id. at 984.
Similarly, in Francis B. v. Mark B., 78 Misc.2d 112 (Sup.Ct. Kings County 1974), the plaintiff, a woman, sought to annul her marriage to the defendant, who allegedly misrepresented herself to be a man and thereby induced the plaintiff into marriage. In its decision, the court noted: "New York neither specifically prohibits marriage between persons of the same sex nor authorizes issuance of marriage license to such persons." _Id. at 117. However, the court stated, "marriage is and always has been a contract between a man and a woman." Id. (citation omitted).
Anonymous and Francis B. are not dispositive of the question presented here, though. They rest in part on the assumption that marriage exists for the purposes of fostering procreation. See _Anonymous,67 Misc.2d at 984 (noting "`public policy that [sexual] relationship [in a marriage] shall exist with the result and for the purpose of begetting offspring'" (quoting Mirizio v. Mirizio, 242 N.Y. 74, 81 (1926)));Francis B., 78 Misc.2d at 117 (citing Mirizio). But physical incapacity, for the purposes of voiding marriage under DRL section 7(3), does not include the "inability to bear children." See supra n. 2.Francis B. also rests on the distinct ground, not presented here, that the plaintiff was fraudulently induced into marriage. See78 Misc.2d at 113.
Additionally, these rulings pre-date the development of U.S. Supreme Court precedent holding that the Equal Protection Clause requires heightened judicial scrutiny where the government uses a gender-based classification, see United States v. Virginia, 518 U.S. 515, 531 (1996);Mississippi University for Women v. Hogan, 458 U.S. 718, 724-26 (1982);Craig v. Boren, 429 U.S. 190, 197 (1976), as well as more recent cases restricting the ability of states to discriminate on the basis of sexual orientation, see _Lawrence v. Texas, 123 S.Ct. 2472 (2003) (striking down Texas ban on homosexual sodomy as unconstitutional intrusion on liberty to engage in private sexual conduct that is protected by the Due Process Clause); Romer v. Evans, 517 U.S. 620 (1996) (holding that amendment to Colorado state constitution barring any legislative, judicial or executive action designed to protect "homosexual, lesbian or bisexual orientation, conduct, practices or relationships" violated the Equal Protection Clause). As discussed below, these cases raise new questions regarding the constitutionality of prohibiting same-sex marriage.
We also note that both the First and Second Departments have interpreted the term "spouse" as used in the EPTL to exclude same-sex partners, but neither court has analyzed the question of the validity of same-sex marriages under the DRL. See Raum v. Restaurant Associates,Inc., 252 A.D.2d 369 (1st Dep't 1998) (unmarried same-sex partner of decedent cannot bring wrongful death action); In re Estate of Cooper,187 A.D.2d 128 (2d Dep't 1993) (surviving partner of a same-sex couple cannot assert spousal rights against deceased partner's will because he is not a "surviving spouse" under the EPTL).
Raum and Cooper are of limited utility here, because the surviving same-sex partners in those cases did not claim any statutory right to marry under the DRL. But see Storrs v. Holcomb, 168 Misc.2d 898, 899
(Sup.Ct. Tompkins County 1996) ("ratio decidendi forged by the Court" inCooper includes the holding that "marriage, in this State, is limited to opposite sex couples"), dismissed on appeal, 245 A.D.2d 943 (3d Dep't 1997) (dismissed for failure to join a necessary party).[4] Moreover, the term "spouse," as used in the EPTL provision authorizing wrongful death actions, has recently been construed to include the surviving same-sex partner to a Vermont civil union. See Langan v. St. Vincent'sHospital of New York, 196 Misc.2d 440 (Sup.Ct. N.Y. County 2003).[5]
3. Constitutional Considerations
The question of whether the DRL authorizes or permits same — sex marriage must be analyzed in light of an ongoing and rapidly shifting debate about whether it is constitutional to deny eligibility for marital status to same-sex couples. We believe that while the DRL does not authorize same-sex marriage, this interpretation raises constitutional concerns.
Before outlining these concerns, we note that courts may respond to any perceived constitutional infirmity in two different ways. First, it remains possible that they might construe the DRL to permit same-sex marriages in order to avoid declaring relevant portions of the statute unconstitutional. It is well-settled that a "statute should be construed when possible in a manner which would remove doubt of its constitutionality." _People v. Barber, 289 N.Y. 378, 385 (1943); seealso Rachelle L. v. Bruce M., 89 A.D.2d 765 (3d Dep't 1982) (substituting gender- neutral language in section 532 of Family Court Act to avoid constitutional infirmity); Lisa M. UU v. Mario D. VV, 78 A.D.2d 711 (3d Dep't 1980) (reading section 514 of Family Court Act in gender-neutral manner to preserve constitutionality); Goodell v. Goodell, 77 A.D.2d 684,685 (3d Dep't 1980) (reading DRL § 236 in gender-neutral manner to include "wife" as well as "husband" to "preserve its constitutionality"). Alternatively, the courts might find that the DRL prohibits such marriages and declare the relevant provisions unconstitutional on that ground. See, e.g., _People v. Liberta,64 N.Y.2d 152, 170-171 (1984) (severing gender classification from state rape statute after holding that portion of statute unconstitutional). Of course, the courts might uphold the statute in its entirety.
a. Equal Protection Clause
One question is whether the DRL, if interpreted to prohibit same-sex marriages, comports with the equal protection clauses of the federal and New York State constitutions.[6] A court might treat the DRL as imposing a gender-based classification. Such classifications are subject to heightened scrutiny; they must "serve important governmental objectives" and "the discriminatory means employed [must be] substantially related to the achievement of those objectives."Virginia, 518 U.S. at 533 (citation omitted); Liberta, 64 N.Y.2d at 168. Even if New York courts applied the less stringent "rational basis review" on the assumption that a prohibition against same-sex marriage is a classification based on sexual orientation, the courts would need to find the prohibition supported by a legitimate state interest in order to uphold it.
Several state interests might be proffered in support of a prohibition on same-sex marriage, including promoting procreation and the welfare of children, and maintaining the traditional understanding of marriage as a union between a man and a woman.
With respect to procreation, the DRL declares voidable a marriage in which either party "[i]s incapable of entering into the married state from physical cause." DRL § 7(3). This provision, however, has long been construed to refer to physical incapacity to consummate marriage, not incapacity to bear children. See supra n. 2.
As to the welfare of children who might be raised by same — sex partners, the DRL already permits the same-sex partner of a child's biological parent, who is raising the child together with the biological parent, to become the child's second parent by means of adoption. See Inre Jacob, 86 N.Y.2d 651 (1995); _cf. 18 N.Y.C.R.R. § 421.16(h)(2) (providing that qualified adoption agencies shall not reject applicants "solely on the basis of homosexuality").
Whether New York's courts would uphold a same-sex marriage prohibition based on an interest in preserving traditional notions of marriage is a closer question. In examining this issue, we briefly review Supreme Court precedent, New York's treatment of same-sex relationships, and decisions from other jurisdictions.
Supreme Court Precedent
The Supreme Court has held that a desire to disadvantage homosexuality cannot be a legitimate government interest. _See Romer,517 U.S. at 634-35. Justice O'Connor's concurrence in Lawrence v. Texas stresses this point; she notes that "moral disapproval" of homosexuals cannot be a "legitimate state interest." 123 S.Ct. at 2486 (O'Connor, J., concurring in the judgment); see also United States Dep't of Agriculture v. Moreno,413 U.S. 528, 534 (1973) (noting that the "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").
At issue in analyzing a prohibition on same-sex marriage is whether preserving tradition constitutes something more than mere disapproval of same-sex relationships. A majority of the Supreme Court has made clear that it does not believe this question is answered by Lawrence. SeeLawrence, 123 S.Ct. at 2484; id. at 2487-88 (O'Connor, J., concurring in the judgment); _cf. id. at 2483 (recognizing that "`neither history nor tradition could save a law prohibiting miscegenation from constitutional attack'" (quoting Bowers v. Hardwick, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting))). In his dissent to Lawrence, however, Justice Scalia suggests otherwise. See Lawrence, 123 S.Ct. at 2496.
New York's Treatment of Same-Sex Relationships
New York law has recognized the legitimacy of committed same-sex relationships in numerous ways, thereby drawing into question the State's interest in maintaining the historical understanding of marriage as confined to opposite-sex partners. The New York Court of Appeals has held that unmarried same-sex partners are protected against eviction. SeeBraschi v. Stahl Assocs. Co., 74 N.Y.2d 201, 211-213 (1989) (long-term interdependent relationship between same-sex partners rendered plaintiff a "family member" of tenant for purposes of 9 N.Y.C.R.R. § 2204.6(d), which prohibits eviction of "any member of the tenant's family" under specified circumstances). Additionally, the New York Legislature has enacted numerous provisions barring discrimination and enhancing penalties for crimes involving animus on the basis of sexual orientation.See N.Y. Civ. Rts. Law § 40-c(2); N.Y. Exec. Law § 296; N.Y. Educ. Law § 313; N.Y. Ins. Law § 2701(a); N.Y. Penal Law §§240.30(3), 485.05(1).
Decisions From Other Jurisdictions
Over thirty years ago, the Minnesota Supreme Court held that same-sex marriages were neither authorized by that state's marriage statute, nor constitutionally compelled. See Baker v. Nelson, 191 N.W.2d 185 (Minn. 1971). The Minnesota court found that there was no equal protection impediment to denying same-sex couples the right to marry because such discrimination was not irrational or invidious. See id. at 187; seealso Standhardt v. Superior Court, 77 P.3d 451, 465 (Ariz.Ct.App. 2003) (prohibition against same-sex marriage does not violate federal equal protection principles); Dean v. District of Columbia, 653 A.2d 307, 361-64
(D.C. 1995) (finding no equal protection impediment to prohibiting same-sex marriage) (opinions of Terry and Steadman, Assoc. J.J., concurring); Singer v. Hara, 522 P.2d 1187, 1189-1197 (Wash. Ct. Appeals 1974) (same).
In Baker v. Nelson, the appellants, a same-sex couple who were refused a marriage license, had challenged this refusal as violative of the federal Equal Protection Clause. See Baker v. Nelson,191 N.W.2d at 187. The U.S. Supreme Court dismissed an appeal from this case, which again raised the equal protection challenge, for want of a substantial federal question. 409 U.S. 810 (1972); Jurisdictional Statement, Bakerv. Nelson, No. 71 — 1027, at 3. While considered rulings on the merits, such dismissals lack the same precedential value as Supreme Court decisions reached after briefing and oral argument on the merits. SeeWashington v. Confederated Bands Tribes of the Yakima IndianNation, 439 U.S. 463, 478 n. 20 (1979). They represent "no more than a view that the judgment appealed from was correct as to those federal questions raised and necessary to the decision." Id. It does not reflect the Court's agreement with the opinion of the court whose judgment is appealed. See id.
While Baker v. Nelson was cited by the Appellate Division to support its conclusion that construing EPTL § 5-1.1 to exclude a homosexual life partner as a "surviving spouse" did not violate the Equal Protection Clause of the New York Constitution, see In re Cooper, 187 A.D.2d 128,134 (2d Dep't 1993), Baker v. Nelson no longer carries any precedential value with respect to the federal Equal Protection Clause. At the time of Baker, a gender classification could comport with the Equal Protection Clause simply by bearing "a rational relationship to a state objective" sought to be advanced. Reed v. Reed, 404 U.S. 71, 76 (1971). However, contemporary equal protection doctrine, which emerged several years afterBaker v. Nelson, see, e.g., Hogan, 458 U.S. at 724-26; Craig,429 U.S. at 197, demands that the government demonstrate that a gender-based classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. See Virginia, 518 U.S. at 533 (citations omitted). Moreover, only after Baker v. Nelson did the United States Supreme Court expressly hold that, even under rational basis review, moral disapproval of homosexuals as a class cannot be a legitimate government interest. See Romer, 517 U.S. at 635.[7]
More recently, in 1999, the Vermont Supreme Court held that the Common Benefits Clause of the Vermont Constitution required Vermont to extend to same-sex couples the same benefits and protections afforded persons married under Vermont law. _See Baker v. State, 744 A.2d 864 (Vt. 1999); see also Goodridge, 798 N.E.2d at 968 (same-sex marriage exclusion violates state constitution's equal protection clause because it is "rooted in persistent prejudices against persons who are . . . homosexual"); id. at 972-73 (Greaney, J., concurring) (rejecting "tradition" as a justification for same-sex marriage exclusion).[8]
Prior to the Massachusetts and Vermont decisions, the Hawaii Supreme Court held that the state marriage statute confining marriage to a union between one man and one woman was subject to strict scrutiny as a gender-based classification under the equal protection provision of the Hawaii Constitution. See Baehr v. Lewin, 852 P.2d 44, 64, 67 (Haw. 1993). On remand, the lower court found that the State failed to demonstrate that the statute was narrowly tailored to advance a compelling state interest. See Baehr v. Miike, 1996 WL 694235, at *21 (Haw. Cir. Ct. 1996).
Other recent lower state court decisions, however, have found that the equal protection clauses of their respective state constitutions permit a prohibition on same-sex marriage. See Standhardt, 77 P.3d at 465
(prohibition against same-sex marriage not so unduly broad as to be "inexplicable by anything but animus"); Morrison v. Sadler, No. 49D13-0211-PL-001946, 2003 WL 23119998 at *9-10 (Ind. Super. Ct. May 7, 2003) ("inherent" distinctions between same-sex and opposite-sex couples, including ability to reproduce, warrant different treatment for purposes of "equal privileges" under state constitution); Lewis v.Harris, No. MER-L-15-03, 2003 WL 23191114 at *23, 26 (N.J.Super.Ct. Nov. 5, 2003) (same-sex couples not similarly situated to opposite-sex couples for purposes of access to marriage; rational for state to conclude that rights of gay and lesbian citizens could be protected without altering the traditional institution of marriage).
b. Fundamental Right to Marry
Another question that might be raised is whether excluding same-sex couples from marriage violates the fundamental right to marry protected under the Due Process Clause of the Fourteenth Amendment. See Loving v.Virginia, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").
In Baker v. Nelson, discussed above, the Minnesota Supreme Court also held that the state's prohibition of same-sex marriage did not violate the fundamental right to marry under the federal Due Process Clause.See Baker v. Nelson, 191 N.W.2d at 186; see also Dean,653 A.2d at 331-33. The precedential value of the U.S. Supreme Court's dismissal of the appeal from Baker v. Nelson, however, is limited with regard to this portion of the decision, as well. The Supreme Court in Lawrence failed to cite to Baker at all, and treated as unsettled the question of whether a State could restrict the rights of same-sex couples to marry without violating the Fourteenth Amendment. See Lawrence, 123 S.Ct. at 2484
("The present case . . . does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."). But see Standhardt, 77 P.3d at 460 (finding no fundamental right to marry for same-sex couples under federal Due Process Clause, even after Lawrence); _Morrison, 2003 WL 23119998 at *4 (citing Baker v.Nelson for proposition that there is no federal constitutional right to same-sex marriage).
Other recent lower state court decisions have also found no fundamental right to marry in their respective state constitutions that would be violated by a prohibition on same-sex marriage. See Standhardt,77 P.3d at 455-60;Morrison, 2003 WL 23119998, at *4-8; Lewis, 2003 WL 23191114, at *16.
In contrast, the Massachusetts Supreme Judicial Court recently held that "[l]imiting the protections, benefits, and obligations of civil marriage to opposite-sex couples" violates the liberty to choose whether and whom to marry that is protected by the Massachusetts Constitution.Goodridge, 798 N.E.2d at 968; see also Opinions of the Justices to theSenate, 802 N.E.2d 565 (Mass. 2004) (proposed civil union scheme for same-sex couples is insufficient to remedy denial of marriage status to same-sex couples); cf. Brause v. Bureau of Vital Statistics, No. 3A-95 — 6562 CI, 1998 WL 88743, at *4-5 (Alaska Super. Ct. Feb. 27, 1998) (finding that "the choice of a life partner is personal, intimate, and subject to the protection of the right to privacy" under the Alaska Constitution), superceded by Alaska Const. art. I, § 25 (effective Jan. 3, 1999) (providing that valid marriage "may exist only between one man and one woman").
4. Recognition of Same-Sex Unions Performed Out-of-State
Whether the Domestic Relations Law permits same-sex marriages performed in New York has no bearing on whether New York will recognize as spouses those parties to a same-sex marriage (or its legal equivalent, see,e.g., Vt. Stat. Ann. tit. 15 § 1201 et seq.) validly performed under the law of other jurisdictions. We therefore address this circumstance separately.
In general, New York common law requires recognizing as valid a marriage, or its legal equivalent, if it was validly executed in another State, regardless of whether the union at issue would be permitted under New York's Domestic Relations Law. The only exceptions to this rule occur where recognition has been expressly prohibited by statute, or the union is abhorrent to New York's public policy. See, e.g., Mott v.Duncan Petroleum Trans., 51 N.Y.2d 289, 292 (1980) (recognizing Georgia common law marriage); In re Estate of May, 305 N.Y. 486, 490-93 (1953) (recognizing Rhode marriage between an uncle and a niece that would have been void if performed in New York); Fernandes v. Fernandes, 275 A.D. 777
(2d Dep't 1949) (marriage by proxy); In re Probate of the Will ofValente, 18 Misc.2d 701, 704-05 (Sur. Ct. Kings County 1959) (same). The abhorrence exception is so narrow that only marriages involving "polygamy or incest in a degree regarded generally as within the prohibition of natural law" have been deemed abhorrent by the courts. Estate of May,305 N.Y. at 491.
Applying this New York common law rule of recognition, the only New York court to have addressed the question recently held that a party to a Vermont civil union must be treated as a "spouse" within the meaning of EPTL § 4-4.1(a), and therefore could bring a wrongful death action.See Langan, 196 Misc.2d 440 . The court concluded that New York's public policy does not preclude recognition of Vermont unions in light of the expansive benefits and protections afforded same-sex couples under the laws of the State, see id. at 446-47, and that denying such recognition where the legal incidents of such unions are coextensive with the legal consequences of marriage would run afoul of the federal and state equal protection clauses, see id. at 454. Langan is currently on appeal to the Appellate Division, Second Department.
Conclusion
We conclude that the Legislature did not intend to authorize same-sex marriages. This interpretation of the statute, however, raises constitutional concerns, which are best resolved by the courts of this State.
Because the purpose of the marriage licensing process is to "provide
a definite, well-chartered procedure for entrance into marriage, so that parties following the statutory requirements can have a fair degree of certainty in their marital status," Practice Commentaries to DRL § 13 at 149, we recommend that clerks not issue marriage licenses to same-sex couples, and officiants not solemnize the marriages of same-sex couples, until these issues are adjudicated by the courts.
Finally, we note that the issue of recognizing same-sex unions from other jurisdictions presents a distinct legal question. Consistent with the holding of the only state court to have ruled on this question, New York law presumptively requires that parties to such unions must be treated as spouses for purposes of New York law.
The Attorney General issues formal opinions only to officers and departments of State government. Thus, this is an informal opinion rendered to assist you in advising the municipality you represent.
Sincerely,
CAITLIN HALLIGAN, Solicitor General
[1] DRL § 23 provides that violations of the DRL are to be reported to the District Attorney in the county where the marriage took place.
[2] While Section 7(3) of the DRL provides that a marriage is voidable if either party "[i]s incapable of entering into the marriage from physical cause," courts have ruled that this provision refers to capacity to consummate a marriage. See _Lapides v. Lapides, 254 N.Y. 73, 80
(1930); cf. Hatch v. Hatch, 58 Misc. 54 (Sup.Ct., Special Term, Erie County 1908) (declining to annul marriage where, because of advanced age, "desire for support and companionship" motivated marriage).
[3] We note that in Levin v. Yeshiva University, a case regarding whether a housing preference for married students had an impermissible disparate impact on homosexual students, the Chief Judge, dissenting in part, observed that "homosexual students . . . cannot marry." 96 N.Y.2d 484,503 (2001) (Kaye, C.J.) (dissenting in part).
[4] At least one unpublished case has held in dictum that New York marriage law does not preclude same-sex marriage, but the court nonetheless found that a surviving gay partner could not inherit from the deceased's estate when there was neither a will nor a marriage license.See In re Petri, N.Y.L.J. April 4, 1994 at 29 (Sup.Ct. N.Y. County) ("Section 13 of the [DRL] has no requirement that applicants for a marriage license be of different sexes.")
[5] The validity of same-sex marriages already performed will likely depend on the outcome of litigation relating to issues identified in this opinion.
[6] The protections afforded by the State Equal Protection Clause are "as broad as" the protections afforded by the Equal Protection Clause of the Fourteenth Amendment. Brown v. State, 89 N.Y.2d 172, 190
(1996).
[7] As noted above, rational review would apply if a prohibition against same-sex marriage were considered a classification based on sexual orientation, rather than gender.
[8] The Massachusetts Supreme Court made clear in Goodridge that the Massachusetts Constitution "is, if anything, more protective of individual liberty and equality than the Federal Constitution."798 N.E.2d at 948-49. Similarly, the New York Court of Appeals has "not hesitated" to grant relief under the New York Constitution when it "concluded that the Federal Constitution . . . fell short of adequate protections for our citizens." Cooper v. Morin, 49 N.Y.2d 69, 79
(1979).